EDGAR L. THOMPSON

*vs.*

LEWISTON DAILY SUN PUBLISHING COMPANY.

Kennebec.    Opinion January 4, 1898.

*Libel.    Pleading.    Colloquium.*

</div>

In order to render words actionable in a suit for libel, it is not necessary that there should be the same precision and certainty in the language employed to make the charge, as in the allegations of an indictment for the same offense.

If the defamatory words, taken in their natural and ordinary signification, fairly import a criminal charge, it is sufficient to render them actionable.

But upon demurrer to the declaration words alleged to be libelous cannot be pronounced actionable by the court unless they can be interpreted as such with at least reasonable certainty.

In case of uncertainty as to the meaning of expressions of which a plaintiff complains, the law requires the pleader to make the meaning certain by means of proper colloquium and averment.

*Held;* that the statement in the defendant's newspaper " he has a wife living in the west" construed with reference to all the other averments in the declaration impute with reasonable certainty to the plaintiff the crime of bigamy or polygamy.

When the manifest purpose of such statement is to suggest criminal conduct with respect to the plaintiff's marriage relations, and considered in connection with the averment in the colloquium that " he had been married to Helen M. Thompson, with whom he was then living as his lawful wife in the town of Monmouth," *held;* that it must be regarded as imputing to the plaintiff the crime of bigamy.

The article complained of in this case related to the arrest of the plaintiff upon the charge of murder. *Held;* that the allusion to the "divorce of the second wife now living in Auburn" is calculated to present a contrast between her legal status and that of "a wife now living in the West;" and that the entire article was apparently designed to exhibit his previous record in such a light as to suggest the probability of the truth of the charge upon which he had been arrested.

ON EXCEPTIONS BY DEFENDANT.

The case appears in the opinion.

*H. M. Heath and C. L. Andrews,* for plaintiff.

*G. W. Heselton and L. T. Carleton,* for defendant.

The demurrer should be sustained because (1st.) the declaration does not declare that Thompson knew of the crime charged. (2nd.) In point of law the words fall short of charging the crime of bigamy. (3rd.) The court in an examination of this case, coming before it on a demurrer, must find that it appears upon the whole declaration that the words are clearly defamatory; and if they are ambiguous they cannot be pronounced defamatory. (4th.) Taking the whole article together and considering its scope and purpose—the legal effect of the very. words of divorced wife and only by magnifying the true meaning of the words—can a libel be invented; and such a course is contrary to the universal rule governing the interpretation of libels.

It is the duty of the court in an action for a libel to understand the publication in the same manner as others would naturally do. The construction which it behooves a court of justice to put on a publication which is alleged to be libelous is to be derived as well from the expressions used as from the whole scope and apparent object of the writer. *Cooper* v. *Greeley.* 1 Denio, 358; *St. James Mil. Acad.* v. *Gaiser,* 125 Mo. 517, (46 Am. St. Rep. 502).

If the above rule is applied, and the construction is to be derived from the whole scope and apparent object of the writer, when we consider his article, but one thought could have arrested the minds of the reader acquainted with the plaintiff's surroundings and that was, Thompson had had three wives—been divorced by two and was living with the third;—and the writer was giving

the history of the arrest and not intending and trying to write a libel on his family relations. While the different cases reported do not give aid in the determination of the case at bar from similar words, still in principle involved the following seem to sustain this rule. *Adams* v. *Stone*, 131 Mass. 433; *York* v. *Johnson*, 116 Mass. 482; *Chase* v. *Sherman*, 119 Mass. 387; *Young* v. *Cook*, 114 Mass. 38; *Brettun* v. *Anthony*, 103 Mass. 37; *Emery* v. *Prescott*, 54 Maine, 389; *Wing* v. *Wing*, 66 Maine, 62.

Counsel also cited: 13 Enc. of Law, pp. 378, and note, 386; *World Pub. Co.* v. *Mullen*, 43 Neb. 126, (47 Am. St. Rep. 737); Odgers on Libel and Slander, 1st Am. Ed. by Bigelow, p. 85, note to § 94. *Hemmenway* v. *Woods*, 1 Pick. 524 ; *Marsh* v. *Davison*, 9 Paige (N. Y.) 580; *Simpkins* v. *Justice*, 1 Ind. 558; *Griggs* v. *Vickroy*, 12 Ind. 549.

SITTING: EMERY, FOSTER, HASKELL, WHITEHOUSE, SAVAGE, JJ.

WHITEHOUSE, J. This is an action of libel for defamatory matter published in the newspaper of the defendant company concerning the plaintiff. The defendant filed a general demurrer to the declaration. The presiding judge overruled the demurrer and the defendant brings the case to the law court on exceptions to this ruling.

The more material parts of the published article, comprising the special matter alleged to be libelous, with the innuendoes as they appear in the declaration, are as follows:—

 "The announcement in yesterday's Sun of the Thompsons' (meaning the plaintiff and his brother) arrest for the murder of J. Augustus Sawyer, caused a surprise to many people in this section of the country, as many people supposed no solution would come. Words of praise were heard for the Sun's enterprise in ferreting out the mystery which has caused so much talk. A resident from near Monmouth remarked that the Sun had done a big thing for that place. ' Why' said the gentleman, ' my folks were afraid, even to this day, to go out of doors alone nights for the fear of being molested' " . . . . "The Thompsons' (meaning the

plaintiff and his brother J. Albert Thompson aforesaid) records (meaning their past conduct or actions) are not of a Sunday School order (meaning that their conduct in the past has not been in accordance with the rules of morality and virtue but has been immoral and in violation of law) Edward Thompson, (meaning the plaintiff) whose true name is Edgar Thompson had lived an eventful life and the authorities (meaning the prosecuting officers of Kennebec county aforesaid) have evidence which will not put him in an enviable light. It is said from other sources that Edward or Edgar Thompson (meaning the plaintiff) has a wife living (meaning that he, the plaintiff, had committed the crime of bigamy and that a person who was then his wife and from whom he has never been divorced, was then still alive and that the said Helen M. Thompson, with whom he is now and was then living, is not and was not then his legal wife but that he is and was then living with her unlawfully) in the west who will probably be secured (meaning that she will be brought to Augusta) as a witness (meaning that she will be summoned to testify as to the character of the plaintiff at the trial of said plaintiff on the said charge of murder.) ' Ed' Thompson (meaning the plaintiff) was divorced by his second wife (meaning the said Abbie E., his first wife, from whom he was divorced as aforesaid) and she is now living in Auburn."

In the colloquium of his declaration the plaintiff avers "that he is and for a long time prior to December 20, A. D. 1895, had been legally married to his wife, Helen M. Thompson, with whom he is now and for several years prior hereto has been living as his lawful wife in said town of Monmouth; that previous to such marriage he was married to one Abbie E. Merriman, and on the 16th day of November previous to his marriage to said Helen M. Thompson, he was legally divorced from her, the said Abbie E. Thompson, and that she, the said Abbie E. Thompson, is now living in Auburn, in the county of Androscoggin and state of Maine; that he has never been married to any other person or persons than the said Abbie E., his first wife, and the said Helen M., his second wife; that he has never committed the atrocious crime of bigamy; that he, said plaintiff was on the eighteenth day of

December, A. D. 1895, arrested and, in company with his brother, J. Albert Thompson, on the 20th day of December A. D. 1895, arraigned before A. G. Andrews, Esq., Judge of the Municipal court of the city of Augusta, within and for said county of Kennebec, on a charge of murder of one J. Augustus Sawyer, and on the said preliminary hearing thereon was discharged as innocent thereof."

It is contended in behalf of the plaintiff that the words "he has a wife living in the west," construed with reference to all the other averments in the declaration are not only capable of imputing, but do clearly impute to the plaintiff the crime of bigamy or polygamy. On the other hand the defendant argues that as there is nothing in the published article to negative the exception found in the statute (R. S., c. 124, § 4,) of "one legally divorced" and "one whose husband or wife has been continually absent for seven years and not known to be living," the words fall short of charging the crime of bigamy and cannot be declared defamatory without magnifying their true meaning.

It is not necessary, in order to render words actionable, that there should be the same precision and certainty in the language employed to make the charge, as in the allegations of an indictment for the same offense. If the defamatory words, taken in their natural and ordinary signification, fairly import a criminal charge, it is sufficient to render them actionable. *Gibbs* v. *Dewey*, 5 Cow. 503 ; *Miller* v. *Miller*, 8 Johns. 74. Written or printed language, alleged to be defamatory, is in law capable of the same sort of modification by explanatory evidence as oral language ; and where, upon trial, the question depends upon evidence to be introduced in connection with the publication, it is properly left to the jury to say whether the language is libelous or not, the same rule prevailing as in similar cases of slander. Odgers on Lib. & Sl. p. 94. Whether or not the language used will bear the interpretation given to it by the plaintiff, whether or not it is capable of conveying the meaning which he ascribes to it, is in such a case a question of law for the court. What meaning the words did convey to the readers is in such a case a question of fact for the jury.

It is not the intention of the writer, or the understanding of any particular reader that is to determine the question. It is rather the effect which the language complained of was fairly calculated to produce and would naturally produce upon the minds of readers of reasonable understanding, discretion and candor, after it has been examined and considered in connection with all other parts of the writing, and in the light of all the facts and circumstances known to them.

But upon demurrer to the declaration, words alleged to be libelous cannot be pronounced actionable by the court "unless they can be interpreted as such with at least reasonable certainty. In case of uncertainty as to the meaning of expressions of which a plaintiff complains, the rule requires him to make the meaning certain by means of proper colloquium and averment." *Wing* v. *Wing*, 66 Maine, 62.

In the case at bar it is the opinion of the court that when the statement "he has a wife living in the west" is considered in the light of the context and of the spirit and purpose of the entire article, and construed with reference to all the facts stated in the colloquium and admitted by the demurrer, it is fairly calculated to convey, and must be held to convey, the meaning which the plaintiff attaches to it. When thus examined, and interpreted according to the natural and popular signification of the words, it clearly imports a charge of bigamy. The communication relates to the arrest of the plaintiff upon the charge of murder. It was published by a newspaper claiming in the same article to have exclusive information in regard to the plaintiff's life and character, and to be entitled to the credit of "ferreting out" a great mystery. It declares that the plaintiff's record is "not of a Sunday School order"; that "Edward Thompson whose true name is Edgar Thompson, has lived an eventful life," and that "the authorities have evidence which will not put him in an enviable light." In the same paragraph follows the gravamen of the matter: "It is said that he has a wife living in the west who will probably be secured as a witness. 'Ed' Thompson was divorced by his second wife and she is now living in Auburn." The popular as well as

the lexical meaning of "wife" is "a woman who is united to a man in the lawful bonds of wedlock." The allusion to the divorce of a former wife is calculated to present a contrast between her legal status and that of a "wife now living in the west," and the entire article was apparently designed to exhibit his previous record in such a light as to suggest the probability of the truth of the charge upon which he had been arrested. The fact that he had been divorced from a wife in the west would have no such tendency. The manifest purpose of the statement was to suggest criminal conduct with respect to his marriage relations; and when it is considered in connection with the averment in the colloquium that he "had been married to Helen M. Thompson with whom he was then living as his lawful wife in the town of Monmouth," it must be regarded as imputing to him the crime of bigamy "with reasonable certainty."

*Exceptions overruled.*