HENRY HAGENER, Respondent, v. PULITZER PUBLISHING COMPANY, Appellant.

Kansas City Court of Appeals, June 16, 1912.

1. LIBEL: Two Charges: One Libelous and the Other not: Instructions. If the matter published is such which standing alone would be libel, is accompanied by such explanation as shows it could not be so (as if one should say of another, he is a murderer, he killed my dog), it is not a libelous publication. But if the matter published consists of two parts, or charges, one which could not be, and the other is, libelous, then an instruction which directs a verdict for defendant because one part could not be a libel, and ignores the other, is properly refused.

2. ————: Quasi Privilege: Public Officer: Investigation. If a public officer, in the line of his official duty, makes an investigation into the charge of unlawful acts of individuals, for the purpose of determining whether the laws have been violated in regard to matters about which there is great public interest and concern, the result of his investigation and of the official action he proposes taking in the enforcement of the violated law, is quasi privileged and may be published, in good faith, by a newspaper, without becoming liable in damages for libel.

3. ————: ————: ————: Prosecuting Attorney: Sheriff: False Accusation: Publication. If a prosecuting attorney of a county, without investigation, falsely charges that the sheriff of the county has violated the law in failing to perform the duties of his office and that he purposes proceeding against him to have him removed from office under the statute for the removal of officers for dereliction of duty, such charges and statement of intention are not quasi privileged, and it is 'ibel to publish them.

Hagener v. Publishing Co.

4. ———: ———: ———: **Slander Uttered by Others: Adoption.** It is not a defense to an action for libel, that the matter had been uttered by others and was published just as it was spoken by others. To publish slanderous words uttered by another is to adopt them.

5. ———: ———: **Other Publications: Unknown: Mitigation.** The defendant in libel cannot show in defense that other newspapers, about the same time, published the same matter, if such publications were unknown to him; though whether such evidence may be received in mitigation, if known to the defendant at the time of his publication, *quaere.*

6. ———: ———: ———: **Other Judgments: Defense.** The defendant in libel cannot show in defense of compensatory damages, that the plaintiff had been paid judgments secured against other newspapers for publishing the same libel.

7. ———: ———: **Sheriff: Coroner's Inquest: Constable: Murder.** It is not the duty of the sheriff of a county to attend the coroner's inquest on the dead body of a person supposed to have been murdered. That is the statutory duty of a constable.

8. **LIBEL: Officers: Duty: Statements of Official: Privilege.** A young woman failed to return home from an afternoon's visit. The sheriff of the county, and citizens, searched for her. Her dead body was discovered several miles from her home, lying in water by the river. The sheriff consulted with detectives and otherwise undertook to ascertain if there had been murder or suicide. He notified the coroner. He then went to a friend's and with him went fishing in a near-by stream and was gone a day and night, and was not at the inquest, that not being his official duty. The prosecuting attorney of the county, without investigation, falsely stated to a newspaper reporter that the sheriff had violated his official duty in failing to attend the inquest and that he intended to prosecute him for dereliction of duty and have him removed from office. The newspaper published what the prosecutor said. It was *held* the publication was libel, and that it was not privileged.

*On Rehearing, Opinion by Trimble, J.*

9. **LIBEL.** Whether an article is libelous or not depends upon the entire article and upon the impression produced by it as a whole.

10. ———: **Construction and Meaning of Article: Question for Jury.** Even though many of defendant's instructions treat the article as limiting the charge against plaintiff to one specific act, yet this will not have the effect of so limiting it if the article itself and plaintiff's construction thereof, as set out in his petition and instructions, will bear a wider meaning

and construction. And it is for the jury to say what is the scope and meaning of the alleged libelous article.

11. ———: ———: **Charging an Official With Neglect of Duty.** Where an article is alleged to be libelous in that it charges an official with general neglect of duty, the fact that a certain act of neglect is mentioned will not be taken to mean that the failure to do this particular act is the sole basis of the charge unless the article clearly, definitely and specifically states that the particular act mentioned is the sole basis of the charge.

12. ———: ———: **Removal of Libelous Poison by Explanation of Charge Accompanying the Alleged Libel.** If the alleged libel is broader and more comprehensive than the accompanying explanation, the latter cannot be held to remove the libelous taint. Where the poison is stronger and more effective than the antidote, the latter ceases to be a cure and is, therefore no longer an antidote in that case, or at least is not an efficient one.

13. ———: ———: ———. To enable a court to say, as matter of law, that an article carries its own antidote to the poison and is, therefore, not a libel, the publication and the antidote must be expressed in terms so clear and unambiguous that no circumstances are required to make it clearer than it is of itself and that but one meaning can be attributed to it by persons of ordinary intelligence.

14. ———: **Privileged or Quasi Privileged.** To make a publication privileged on the ground that it was the report of the announcement of the official acts or proposed policy or intention of a governmental officer, the facts must show that it was such as would redound to the instruction and advantage of the public to know. If it was merely the expression of one officer's private opinion upon a matter not then before the public mind and in which the public would have no particular interest or right to be informed upon, then it is not privileged. Case distinguished from those of Tilles v. Publishing Co., 241 Mo. 609 and Bank v. Goodwin, 148 Mo. App. 364.

Appeal from Cole Circuit Court.—*Hon. John M. Williams,* Judge.

AFFIRMED (*conditionally*).

*Judson, Green & Henry* for appellant.

(1) The court erred in submitting this case to the jury, because the article complained of on its face is clearly not libelous, and no innuendo can make it so.

This is true because it was undisputed that the facts respecting the sheriff's absence from the inquest are correctly stated in the article; and this statement itself discloses that the negligent conduct of the sheriff referred to was not criminal under any statute of this State. To constitute a misdemeanor, or to subject an officer to removal from office under the direlict officials act, the neglect of duty must be willful, malicious and from corrupt or fraudulent motives. State v. Boyd, 196 Mo. 52; State v. Pringer, 57 Mo. 243; R. S. 1909, sec. 10204; Hall v. Adkins, 59 Mo. 148; Newell on Libel (2 Ed.) 568; Deiner v. Star, 232 Mo. 416; Klos v. Lahorie, 113 Iowa, 164; Ayers v. Gridley, 15 Ill. 38; McGilvey v. Spring, 58 Ill. App. 276; Odgers on Libel (1911 Ed.), 203; Trimble v. Foster, 87 Mo. 50. (2) The article is not libelous and the petition states no cause of action. It cannot, therefore, be preverted or twisted by any innuendo into the signification contended for by plaintiff. The meaning of plain unambiguous language cannot be extended by an innuendo. Branch v. Knapp & Co., 222 Mo. 580; Deiner v. Star Chronicle, 232 Mo. 416; Christal v. Craig, 80 Mo. 373; Ukman v. Daily Record Co., 189 Mo. 378; Cook v. Pulitzer Pub. Co., Sup. Ct. 1911; Howarth v. Barlow, 115 App. Div. (N. Y.) 510; Smith v. United States, 175 Fed. 240. (3) It is always reversible error to assume the truth of controverted facts in instructing the jury. Siegrist v. Arnot, 10 Mo. App. 197; Mathews v. Railroad, 26 Mo. App. 75; Rice v. McFarland, 41 Mo. App. 489. (4) Instruction No. 4 for plaintiff contains reversible error in that it assumes that this article charged plaintiff with willful and intentional neglect of duty, when it is clear from the article itself that no one could have understood from reading it that the sheriff's conduct in going fishing was due to anything except the feeling that he was not needed at the coroner's inquest, and that like Simon Peter, he wished to go fishing. This instruction is also erroneous in

that it omits the element of corrupt motive which is
a necessary element under our statute to render one
guilty of criminal neglect of official duty such as was
necessary to render the article libelous, *per se.* State
v. Boyd, 196 Mo. 52; State v. Pringer, 57 Mo. 243; R.
S. 1909, sec. 10204. (5) Plaintiff's instruction No. 7
is erroneous in that it declares that good faith on the
part of defendant in making said publication of this
privileged article would not prevent plaintiff from re-
covering actual or compensatory damages. In both
comment and privilege good faith is a bar to the re-
covery of either actual or compensatory damages and
this instruction omits any such qualification and the
omission is not cured by any other instruction given
in the case for either plaintiff or defendant. Finley
v. Steele, 159 Mo. 307; Tilles v. Pulitzer Pub. Co.
(Court in Banc, Oct. Term, 1911); Cook v. Pulitzer
Pub. Co. (Oct. Term, 1911). (6) Plaintiff's instruc-
tion No. 10 contains reversible error in that it contains
vicious and unjustifiable comment on the evidence and
singles out, directs attention to, and emphasizes cer-
tain evidence favorable to plaintiff. It is always re-
versible error for a trial court to comment on the evi-
dence. Smith v. Sovereign Camp of Woodmen, 179
Mo. 119; McFadin v. Catron, 120 Mo. 252; Kaiser v.
South St. Louis Ins. Co., 7 Mo. App. 579; Barr v. Kan-
sas City, 105 Mo. 550.

*Silver & Dumm* for respondent.

(1) A newspaper is responsible for what it pub-
lishes, the same as an individual. Johnson v. Post-
Dispatch Co., 65 Mo. 539; Arnold v. Star Saying Co.,
76 Mo. App. 159; State v. Sheppard, 177 Mo. 244;
Sheckell v. Jackson, 10 Cush. 25; Haynes v. Press Co.,
169 Mass. 512; McDonald v. Woodruff, 2 Dillon Rep.
24; Upton v. Hume, 24 Oregon, 420; 2 Greenleaf on
Evidence (16 Ed.), sec. 398. (2) The case, as stated

Hagener v. Publishing Co.

in plaintiff's amended petition, was one for the jury. An instruction to the jury that an article is not libelous, is proper only in case the language is incapable of a construction injurious to plaintiff. Morris v. Sailer, 154 Mo. App. 312; Sanderson v. Caldwell, 45 N. Y. 401; Warner v. Southall, 4 Excheq. L. R. 284; Witcher v. Jones, 17 N. Y. Supp. 491, 492, 493.

ELLISON, P. J.—Plaintiff was the sheriff of Cole county, and in his petition in this action charges defendant, who publishes a newspaper in the city of St. Louis, of large circulation, with libeling him. He recovered compensatory and exemplary damages in the circuit court.

The published matter set out as the libel is as follows:

## "CHARGES SHERIFF WITH FISHING AT TIME OF INQUEST.

Cole County Official May Face Proceedings to Oust Him for Dereliction of Duty.

Jefferson City, Mo., July 2.—Jack Slate, prosecuting attorney of Cole county, said this morning that he may institute proceedings against Henry Hagener, sheriff of Cole county, under the derelict official act and seek to have that officer removed from office.

"Slate said it was the duty of Sheriff Hagener to have been here yesterday morning when the coroner's inquest was held, and to have done what he could yesterday toward clearing up the mystery surrounding the death of Miss Anna Wendler, whose body was found in the Missouri river Thursday night. Hagener, the prosecuting attorney said, went fishing with a party of friends yesterday morning.

"Hagener is still out of the city. The coroner's jury asked about a pipe stem and a quantity of tobacco which was found near the effects of the girl on the

right of way, but it was stated that they were in the sheriff's possession and were not available.''

There is a rule in the law of slander that if one utters a charge against another, but accompanies it with such statement as to show it could not be true (as if one should charge ''he is a murderer—he killed my dog''), then, it is said, the antidote has been sent along with the poison and the charge is not slander. Defendant is seeking to apply this rule to a case in libel and to go free of plaintiff's action on the ground that, while it did publish that plaintiff had violated his official duty and was going to be prosecuted for it and turned out of office, for not attending upon the coroner at the inquest; yet, since it was the law that attendance upon a coroner's inquest was not a part of a sheriff's duty, no libel could be made out of the publication.

Without deciding at this place that the rule would, or should, apply to a case of this character (on which subject, see Brown v. Knapp, 213 Mo. l. c. 680-686; Perselly v. Bacon, 20 Mo. l. c. 337; Prewitt v. Wilson, 128 Iowa, 198, 202), we find that if it were conceded to apply, it would not acquit the defendant. For this publication not only charges a violation of duty in plaintiff's failing to attend on the coroner, but also contains the separate charge that he had violated his official duty in not doing what he could toward clearing up the mystery surrounding the death of the young woman. Now it is the official duty of a sheriff to employ all reasonable means and use all reasonable endeavor to discover whether a person, suddenly missing in the community and found dead, under circumstances indicating foul play, had been murdered, and to find and arrest the guilty parties. Therefore a violation of duty for which plaintiff was to be prosecuted and ousted from office, was charged, and it was libelous *per se*. For it is well-recognized law that to falsely charge a public officer with a willful breach of his offi-

cial duty is libelous *per se*. The evidence in the case shows fully the efforts plaintiff made along the line of his official duty, from his first information of the young woman being missed. It was for the jury to say whether he had been falsely charged with a failure to perform such duty; and we find that phase of the case was submitted by defendant's instruction No. 7.

It is true that plaintiff, in instructions given at his instance submitted to the jury the charges of dereliction of duty in failing to attend upon the coroner. If this was error, it was condoned by defendant in asking similar instruction on its part.

We are not unmindful that a party will not be held to have condoned erroneous instructions for the other party, where he has first sought to have the erroneous matter excluded by instructions which have been refused. In this case that was not done. It is true defendant offered a demurrer to the evidence, but that was properly refused, since it carried with it an assertion that plaintiff could not recover for the other charge of which we have spoken. And the same may be said of refused instruction "B;" it directed a verdict without regard to the other charge. Indeed it appears that defendant did not indicate in any way, by pleading or otherwise, that it intended a defense on the ground that no libelous matter was charged.

But allowing that the published matter did not contain a charge of breach of official duty other than a failure to attend upon the coroner, we are of the opinion, that so confining the publication, it was yet a libel to charge him with a breach of official duty for which he was to be expelled from office, for failure to attend upon the coroner, notwithstanding that in law it was not his duty and its nonperformance would not, in law, make him liable to expulsion from office. In other words, we hold the fact that the charge made does not, in law, constitute a breach of official duty for which an officer may be expelled from his office,

yet if the charge is such as will bring the officer into disgrace, "expose him to public hatred, contempt or ridicule, or to deprive him of the benefits of public confidence and social intercourse," it is libelous. [Sec. 4818, R. S. 1909.] In such case the mere fact that persons learned in the law may know that there has been no breach of duty, is not an antidote to the poison which will affect the minds of the general public. The rule seems to be different in slander. However unreasonable it may be, it appears to be established not to be slander to call one a thief accompanying the charge with such statement of the act as shows it could not have been larceny as defined in law. Thus it was held not to be slander to charge one with stealing the fixtures on another's land, such as cribs and grain bins (Trimble v. Foster, 87 Mo. 49); or for a landlord to charge his tenant with stealing his corn, the latter being in possession of the crop and upon which the former had a lien for the rent (Hall v. Adkins, 59 Mo. 144); or that he stole the windows from another's house (Wing v. Wing, 66 Me. 62). So if one charges another with stealing corn, the corn being on the stalk, it is held not to be slander; but if it be corn severed from the stalk and lying upon the ground, it is. [Stitzell v. Reynolds, 67 Pa. St. 54.] And if one says to another: "You are a thief, you have stolen my marle," it is said not to be slander for the reason that marle being a part of the land is not, in law, subject to larceny. [Ogden v. Riley, 14 N. J. L. 186.] So, if one charges a treasurer "has robbed the treasury of a sum of money and bought a farm with it," it is said not to be slander, since to appropriate money of which you are in possession does not come within the definition of robbery as legally understood. [Allen v. Hillman, 12 Pick. 101.] So it was once understood by lawyers that in the old common law an unmarried woman could not commit adultery, since it was an injury to the family, the blood of which could

not be adulterated except through a married woman. If that should be considered to be the law now (see State v. Holland, 162 Mo. App. 678), we suppose, in view of these cases, it would be insisted that if one should falsely state that a woman had committed adultery, and in other parts of the statement incidentally showed she was not married, it would not be slander. But we would be slow to believe that at this day, the canon law having superseded the old common law, our courts would make such pronouncement. [State v. Holland, supra.] We can fully acquiesce in the statement that where the charge is accompanied by such explanation as makes it apparent to the general public— to unprofessional people of ordinary understanding— that the charge could not be true, an action for slander would not lie. But when this rule is spread to such breadth, as in the cases last cited, being charges which are not offenses as defined by law but which the general public would understand to be such, we accept it under the same protest which has been made by many eminent judges.

In this connection and in view of the fact that, in point of law (as already stated), it was not plaintiff's official duty to attend upon the coroner, defendant seeks exculpation under the authority of our Supreme Court in Trimble v. Foster, and Hall v. Adkins, above noted. But, as we have seen, those cases and the others we have cited were actions for slander. The same charges, if put in print and published, would have been libelous. "Many words which would not be slanderous *per se* become libelous *per se* when printed and published." [Ukman v. Daily Record Co., 189 Mo. 378, 392; Hermann v. Bradstreet Co., 19 Mo. App. 227.] Thus, to publish that one testified or "swore terribly" and was "no slouch at swearing to an old story," while not constituting a charge of perjury in a legal sense, yet as they expose the party charged "to contempt and ridicule," the words are libelous.

[Steele v. Southwick, 9 Johns. 214.] The case of Thorley v. Lord Kerry, 4 Taunton, 355, contains much interesting comment by MANSFIELD, C. J., in which the rule is stated that an action may be maintained for words written, if they tend to villify a man or bring him into hatred, contempt and ridicule, though the words would not constitute slander. To the same effect is Cooper v. Greeley, 1 Denio, 347, 362.

"Much, which if only spoken might be passed by as idle blackguardism doing no discredit save to him who utters it, when invested with the dignity and malignity of print, is capable by reason of its permanent character and wide dissemination of inflicting serious injury. The cases, ancient and modern, where this distinction has been regarded, are numerous." [Tillson v. Robbins, 68 Maine, 295.]

"For obvious reasons, the presumption that words are defamatory arises much more readily in cases of libel than in cases of slander. Many words, which if printed and published would be presumed to have injured the plaintiff's reputation, will not be actionable *per se,* if merely spoken. A slander may be uttered in the heat of the moment, and be almost as quickly forgotten, while the same words, written and published, not only show greater deliberation and malice, but are almost certain to inflict greater and more enduring injury." [Collins v. Dispatch Pub. Co., 152 Pa. St. 187, 190.]

The same distinction is made by all the text-writers. [Folkard's Starkie on Slander, 230-232; Townsend on Slander & Libel, sec. 18; Newell on Slander & Libel, sec. 77.] And the definitions given in Bacon's Abridgement, Comyns Digest, Hawkins' Pleas of the Crown, and Blackstone, do not require that a libel must impute a crime. The distinction between a slanderous charge and one in libel and the reason therefor, is so well stated by Judge LAMM in Ukman v. Daily Record

Co., supra, that we need not occupy more space in the discussion than to refer to that case (391-394).

Published matter in a newspaper is not designed for the reading of a few experts learned in the law. It is addressed to all the people in all walks of life. That it does not contain a correct statement of the law, as understood by lawyers and judges, does not hinder its being such matter as tends to disgrace the victim and to expose him to "contempt" and "to deprive him of the benefits of public confidence and social intercourse."

It is doubtless true, as intimated at the outset, that an antidote—an explanation—can be published with an otherwise libelous charge, which, on its face, relieves it of its hurtful character; but such explanation must be in language that can be understood by persons of ordinary intelligence, for it is principally with such persons that the defamation finds lodgment; and the object of the law is to protect one's name and character with the large mass who compose that class of the people, as well as with that comparatively small number who have expert professional learning. [Foster-Milburn Co. v. Chinn, 134 Ky. l. c. 430, 431.] If this were not true, the word "public" should be stricken from the statute, and libel should be defined as a defamation of a person by a publication tending to expose him to the hatred, contempt or ridicule of lawyers, and to deprive him of their confidence and society. We think these observations directly supported by Brown v. Knapp, 213 Mo. l. c. 680-682; Deford v. Miller, 3 P. & W. (Pa.), 103—approved in Perselly v. Bacon, 20 Mo. l. c. 338—as well as Prewitt v. Wilson, 128 Iowa, l. c. 202.

We have been cited to Macurda v. Lewiston Journal Co., 109 Me. 53 (82 Atl. 438), as containing different views. That case was for libel. The plaintiff had been indicted in Massachusetts for forgery and the defendant published that he has been "indicted for

larceny,'' specifying that he had been ''indicted for procuring a genuine signature to be affixed to an instrument, the false making of which would be forgery.'' Though the paper charged the indictment was for larceny, it immediately stated, specifically, it meant forgery; a charge it had a right to publish. Almost the entire course of the opinion supports the view we have stated as to the requisites of an antidote. The answer of defendant in that case avers ''that the effect of the article, as a whole, is calculated to convey to the mind of the reader of *reasonable understanding, candor and discretion* the precise offense for which the plaintiff was actually indicted.'' (Italics ours.) And so the court said, in quoting from Thompson v. Sun Co., 91 Me. 203, that: ''It is rather the effect which the language complained of was fairly calculated to produce and would naturally produce upon the minds of readers of reasonable understanding, discretion and candor, after it has been examined and considered in connection with all other parts of the writing, and in the light of all the facts and circumstances known to them.'' This statement, in substance, is repeated several times. Furthermore, the court states in the third division of the opinion, that it is not ''necessary in determining the effect of the entire article upon the specifically alleged libel, that the reader should be able to make the legal distinction between the offense charged in the alleged libelous words and the offense described in the entire article.'' Again, in the last paragraph of the third division of the opinion, the court, referring to the refinement of allowing the last clause to explain the first, in the charge referred to in Allen v. Hillman, supra, that: ''He is a thief; he has stolen apples from my trees,'' and thereby change a felony into a trespass, said that ''it could hardly be expected that even the intelligent and candid layman would be able to make this legal distinction. It is undoubtedly generally understood

that stealing apples from trees is larceny." After these statements, we do not understand the seeming contradiction thereto, which the court adds in these words: "Yet not being so legally understood the charge is not regarded as libelous or slanderous." The decision of the case before the court was undoubtedly right, and however the remark last quoted may be regarded, we consider the views which we have stated to be in strict accord with Brown v. Knapp & Co., 213 Mo. l. c. 680-682. The publication in question was made by a great metropolitan daily paper. It stated that the prosecuting attorney said it was plaintiff's duty to attend upon the coroner and that he had run from that duty, for which dereliction he (the prosecutor) intended to oust him from office. It is poor solace to plaintiff to turn him out of court, telling him that an investigation of the law showed that though it was a false charge and that it was not his duty, yet he was without remedy.

The principal defense made by defendant is that the matter published was privileged. The ground of such plea will be understood when it is stated that the evidence disclosed that a young woman, residing with her father in the country in Cole county, left home the 28th of June, 1910, and went for an afternoon's visit to her uncle's family, who resided about three miles away. She left her uncle's house for home about six o'clock, and shortly thereafter was seen going along the Missouri Pacific railway tracks towards her home, the railway being a short distance from the Missouri river. She was not seen alive again. Not getting home that night, her family supposed she had concluded to stay at her uncle's and no alarm was given until the next afternoon, when search was begun, especially up and down the railroad right of way. About a mile from her home, a place was found on the right of way where weeds and grass had been trampled down for a

space of about six feet in length and near the same in width, and here, too, were found her umbrella, basket, handkerchief, bonnet and one of her shoes. There was some hair in the bonnet. The next day (second after her disappearance) a fisherman saw her body, near shore, in the Missouri river, about four miles from her home and three miles from the articles of clothing found in the grass, and, strange to say, *up* the river. Plaintiff, residing at Jefferson City, the county seat, did not learn that the young woman was missing until the next evening, several hours after others were searching for her. At daylight next morning he started for her father's and reached there about five o'clock. He spent several hours looking, but found nothing additional to what has been mentioned. He returned to Jefferson City to consult with a detective, and on that afternoon he learned of the fisherman finding the body, when he notified the coroner and he, with one of his deputies, went out to where the body was found and again searched for clues. He then returned to Jefferson City, leaving his deputy on the scene. The next morning he went fishing, under an engagement made some time previous; but on the way went by the scene and again made effort to find something connected with the affair. He stayed all night and returned to Jefferson City next morning. On the day he was fishing, the coroner held the inquest, but plaintiff was neither subpoenaed nor requested to attend. It seems that at or near where the weeds and grass were trampled and articles of the girl's wearing apparel were found, there was found a pipe and some smoking tobacco and plaintiff took these with him to Jefferson City and locked them in his desk. At the inquest, the coroner made inquiry for them and could not get them. It seems that different theories were entertained as to the young woman's death. Some thought murder only, some murder and outrage, and others suicide; plaintiff being of the latter opinion.

However the fact may be, the verdict at the inquest was that of murder by persons unknown.

It appears that the prosecuting attorney, as stated by him on the witness stand, had some feeling in the matter. He testified that "he had no personal feeling against Sheriff Hagener, only in an official capacity." We think it clear, however, from the evidence that he was unfriendly with plaintiff. At any rate he became possessed of the idea that it was the plaintiff's duty as sheriff to attend the inquest, and he made the statements to the defendant's reporter which are attributed to him in the publication.

We may remark at the outset, we do not observe that defendant undertook to enlarge upon the statement of the prosecuting attorney, and therefore we have not the question here of fair and impartial comment, recently discussed by Judge KENNISH in Cook v. Publishing Co., 241 Mo. 326.

If the matter published was what is known in the law of libel as privileged or *quasi* privileged, then the publication was not libelous in a legal sense, unless there be express malice. Preliminary to an inquiry whether it was privileged, it is important to say whether it was plaintiff's official duty as the sheriff of the county to attend the coroner's inquest. We conclude it was not. The statute makes it the duty of the constable of the township to attend the coroner at an inquest. [Secs. 2925, 2926 and 2955, R. S. 1909.] And it seems to exclude the sheriff by providing that if the constable cannot act, the officer taking the inquest must call upon a "householder" (Sec. 2938) in his stead.

It is therefore to be considered in determining the liability of defendant, that the matter of the charge of dereliction of duty whereby plaintiff might have been ousted of his office (Secs. 10204-10210, R. S. 1909) and rendered ineligible thereto, and whereby he might have been punished for misdemeanor in office (Sec.

4416) was false; and being false, it was clearly libelous, unless privileged.

Defendant says that the matter was not published as emanating from itself, but as being matter which Slate, the prosecuting attorney, had said, and that it was true that Slate had stated the very things published. This then brings us to the question, were the mistaken utterances of Slate privileged to be published by a newspaper because they were the words or charges of a prosecuting attorney, whose duty it was to prosecute officers guilty of crimes and misdemeanors? It is agreed all around that a fair and impartial report of court proceedings, without malicious coloring, is privileged, though the things transpiring and thus reported are false. And on the authority of one of the late decisions of the Supreme Court (Tilles v. Publishing Co., 241 Mo. 609), a statement by a State official of the result of an investigation by him, which it was his official duty to make, about matters of great public interest, was privileged matter for publication, in an action for libel by the party investigated.

In that case a corporation known as the "Delmar Jockey Club" had as a part of its possessions the "Delmar Race Track," at which bookmaking, poolselling and registering of bets made on the speed of horses, was carried on. The Legislature enacted a law prohibiting such acts, pronouncing them to be gambling and a felony committed by any one engaged therein and punishable by imprisonment in the penitentiary. It appears that the directors and managing officers of the corporation announced an intention to proceed with the business as before the enactment of the law. It was public talk throughout the State that gambling of that nature was still carried on, with the permission and invitation of the directors and officers of the corporation. An investigation of the matter was had by the Governor and Attorney-General, to see if it were true that these corporation officials were inviting

and permitting such violations of law on their grounds.
After this investigation had been completed, the At-
torney-General stated to the defendant's newspaper
reporter the results thereof, in the following language:
"These men are engaged in the commission of an open
felony and the owners of the race track are equally
guilty with the bookmakers under the statute.   The
law must be enforced, and we are going to punish ev-
erybody who violates it."   And it was so published
in the paper.  A libel suit by one of the directors and
owners followed.   In an elaborate opinion by Judge
GRAVES, the question of privileged publication is dis-
cussed, and the matter just quoted from the Attorney-
General was ruled to be *quasi* privileged.   The service
of publicity thus rendered to the people, if performed
in good faith, rebuts the presumption of malice aris-
ing ordinarily from the publication of false charges,
and the good done for the public so far outweighs and
overbalances the inconvenience suffered by individ-
uals, that immunity for the publisher is said to rise
to the dignity of public policy.

In considering the Tilles case with reference to its
effect upon the acts of a publisher in connection with
the acts of public officers, it is of vital importance to
notice that it is not said either in that case or in Bank
v. Goodwin, 148 Mo. App. 364, that immunity should
be given the publisher of *all* statements of an officer,
though they may refer to his official duties.  We think
it requisite that the official must have investigated the
matter involving the person affected, and the publica-
tion must have been a statement of the result of such
investigation and of the officer's intentions in behalf
of the public.   Those are the things in which the pub-
lic are interested and are entitled to know, and for
the publication of which no liability would be incurred.
So it is stated in Brown v. Globe Printing Co., 213
Mo. l. c. 636-639, that even in court proceedings where
no judicial action has been had, a publication is not

privileged.   There would be no privilege extended to the publication of an officer's unfounded and baseless suspicions which have arisen without proper investigation.   If an officer should call in a newspaper reporter and relate to him what he expected to do with certain persons, naming them, and saying that these persons (though honest men) were thieves, and those others (though innocent women) were prostitutes, the publisher should not be allowed the claim of privilege for so great an outrage, even though the officer may have thought he was speaking the truth.

It will be observed in all the cases, including that of Tilles, which uphold what is termed *quasi* privileged publications, it is recognized that the privilege is one liable to great abuse, and hence the endeavor appears throughout all discussion of the question, to restrain practical application of the privilege with well-defined rules, so as to forestall disguised malice, as well as carelessness, or indifference to the rights of others.

In this case there appears the statement of the prosecuting attorney that it was the official duty of plaintiff, as sheriff of the county, to attend the coroner's inquest, and that he had gone away fishing, and that he might institute proceedings against him and have him removed from office under the derelict officials act.   We have already seen that plaintiff had not done anything to make him amenable to the law and that it was no part of his duty to attend on the coroner in the inquest.   The charge of malfeasance in office and breach of official duty was based upon a misconception of the statute and was made without investigation.   It bears no approach to an official act or statement, the publication of which is privileged.   Plaintiff had not been investigated as Tilles had, such investigation being the very ground of the decision; the court saying that ''under these circumstances there was privilege, or at least, a qualified privilege in the publication.''   That case does not cover, and ought not to be

considered as covering, facts wholly unlike those which controlled it; for, "He who seeks to stretch a wholesome rule beyond its legitimate application, attacks the rule itself." The matter published in this case was a mere voluntary statement of a false accusation and an intended prosecution.

We are next brought to the question whether defendant can escape liability for publishing libelous matter by showing that it was a correct publication of what Slate had said, and we answer that it cannot. [Brown v. Globe Printing Co., 213 Mo. 611, 643.] To publish, even though correctly, the slanderous words uttered by another, is to adopt them. It would be gross injustice to say that one called to account for slander or libel can escape by the plea that another told him. In Anthony v. Stephens, 1 Mo. 254, it was held to be error to permit the defendant "to prove that the same words were spoken by others, and that it was a current report. . . . Each one must answer for his own acts." In Hotchkiss v. Oliphant, 2 Hill, 510, it is said that: "The act of publication is an adoption of the original calumny, which must be defended in the same way as if invented by the defendant." In Haynes v. Clinton Printing Co., 169 Mass. 512, 515, it is said that "the same rule applies to repetitions or insinuations of what is false as applies to false statements directly made."

And so the trial court refused to permit defendant to show that like publications were made by other newspapers of the same matter, about the same time, and complaint is made of this ruling. We think it correct. We do not see wherein the same wrong committed by others should excuse defendant. [Anthony v. Stephens, supra; Palmer v. Matthews, 162 N. Y. 100; Pfister v. Milwaukee Free Press, 139 Wis. 627, 641; Palmer v. Mahin, 120 Fed. Rep. 737; Wilson v. Fitch, 41 Cal. 363; Folwell v. Providence Journal Co., 19 R. I. 551; Morse v. Printing Co., 124 Iowa, 707.]

From this it would be but a step to allowing proof, in bar of compensatory damages, that the plaintiff in an action of libel or slander had already been compensated therefor in an action against another person who had published or uttered the same thing. We have not heard of a matter like that being allowed. [Folwell v. Prov. Journal Co., supra.] In that case it was said that: ''The acts of other publishers are independent acts, which could in no way affect the defendant. In Saunders v. Mills (6 Bing. 213), a defendant having been allowed to show at the trial that he had copied an article from another paper, but not allowed to show that it had appeared concurrently in other papers, the motion for a new trial upon this ground was denied. The admissibility of the testimony is urged both to show the jury that whatever injury the plaintiff has sustained to his reputation was not caused by the defendant alone, and that he has received from others an amount which would go to compensate him for his injury. We are aware that it is possible for a plaintiff in a case like this, where many parties are liable for practically the same libel, to recover sums which, in their total amount, may exceed a fair compensation for his injury. But this is a possibility which cannot be avoided in cases where there is no pecuniary standard for the assessment of damages, and where the matter must be left to the discretion of a jury.''

There is authority for the proposition that other like publications might be evidence in mitigation, if they were known to the defendant at the time of its publication. That we need not decide. As there was no showing that this defendant knew of the publications offered in evidence, when it made its publication, the offer was properly rejected, even though it was admissible if there had been such knowledge. [Hatfield v. Lasher, 81 N. Y. 246; Palmer v. Mahin, supra; Barkly v. Copeland, 74 Cal. 1; Lothrop v.

Adams, 133 Mass. 471; Sun Printing & Pub. Assn. v. Schenck, 98 Fed. Rep. 925; Butler v. Barret, 130 Fed. Rep. 944.]

Defendant offered the verdict of the coroner's jury and complains of its refusal by the court, on the ground that it tended to show defendant's good faith. We can see no possible bearing it could have had on the case, or how it could have influenced defendant's action.

What we have written disposes of objections to instructions except those of a technical nature. After a careful reading of those given and refused, we are satisfied that a fair presentation of the law was had, and that no just ground of complaint exists except as to the question of excessive damages. The verdict and judgment were for four thousand dollars, which we think, in all the circumstances developed by the record, was too large; and we have concluded that if plaintiff will, within ten days from notice to that effect, enter a remittitur for fifteen hundred dollars, the judgment will be affirmed; otherwise it will be reversed and remanded. All concur.

## ON REHEARING.

TRIMBLE, J.—The foregoing opinion by Judge ELLISON was handed down November 11, 1912, after the case had been argued and submitted at the October term, 1912, of this court. A rehearing was granted and the cause was again argued and submitted at the March term, 1913.

Appellant contends that the opinion delivered is erroneous in holding that the article complained of charges plaintiff with any dereliction of duty except the failure of plaintiff to be present at the coroner's inquest. While we still regard the article as libelous even if it could be said to charge plaintiff with but the one dereliction of duty (that of failure to attend

the inquest), yet, as appellant has so earnestly presented the above contention, we will consider it on the grounds assumed in the motion for rehearing; and, in this opinion, will examine the question whether or not the article can be limited to the mere failure to attend the inquest.

Whether an article is libelous or not depends upon the entire article and upon the impression produced by the article as a whole. [Macurda v. Lewistown Journal, 82 Atl. 438.] In order, therefore, to determine whether the article as a whole is defamatory and charges plaintiff with any other dereliction of duty than merely the one act of failing to appear at the inquest, let us read the whole article. It is as follows:

## "CHARGES SHERIFF WITH FISHING AT TIME OF INQUEST.

"Cole County Official May Face Proceedings to Oust Him for Dereliction of Duty.

"Jefferson City, Mo., July 2.—Jack Slate, prosecuting attorney of Cole county, said this morning that he may institute proceedings against Henry Hagener, sheriff of Cole county, under the derelict official act and seek to have that officer removed from office.

"Slate said it was the duty of Sheriff Hagener to have been here yesterday morning when the coroner's inquest was held, and to have done what he could yesterday toward clearing up the mystery surrounding the death of Miss Anna Wendler, whose body was found in the Missouri river Thursday night. Hagener, the prosecuting attorney said, went fishing with a party of friends yesterday morning.

"Hagener is still out of the city. The coroner's jury asked about a pipe stem and a quantity of tobacco which was found near the effects of the girl on the right of way, but it was stated that they were in the sheriff's possession and were not available.

"Deputy Sheriff Al Walther and Constable W. W. Gilliam are making investigation. Sheriff Hagener's friends say that the sheriff does not believe that the girl was murdered, but that she came to her death from an accident or by her own hand.

"Hagener's friends say, with reference to Slate's statements that Hagener is not careful enough of the safekeeping of persons confined in jail; that escapes which have been made were not his fault. The jail is weak, and it is hard to keep a determined prisoner in it, they say.

"A dog which followed Miss Wendler, on the afternoon she spent at Will Ferth's, was seen Thursday near the body, which was found near Jefferson City. This is said to strengthen the theory that the girl was forced to walk the distance of three miles with her assailants, the dog following.

"Sheriff Hagener returned to Jefferson City this morning and offered a personal reward of $100 for the arrest and conviction of the party or parties who killed Miss Anna Wendler. He also employed J. H. Culp, a Missouri Pacific detective, to assist him in the search."

The above article was set forth in full in the petition, and the innuendo alleged that the appellant meant and charged and intended to charge, and which the readers of defendant's newspaper might reasonably understand and suppose it did charge, that plaintiff as sheriff of Cole county, Missouri, "had been guilty of neglect of duty enjoined on him by law in relation to the apprehension of the supposed murderer or murderers of said Anna Wendler" and that "as said officer he was indifferent to and unmindful and neglectful of his duty and faithless to the same," and "had been guilty of improper conduct, neglect and dereliction of duty in his said office in relation to the aforesaid disappearance and death of said Anna Wendler *and to the coroner's inquest* held over her

body'' and that the improper conduct, neglect and dereliction of duty ''was of so willful, heinous and flagrant a character as to authorize and require his removal from said office of sheriff of Cole county, Missouri, on proper proceedings instituted into the courts of this State to that end and for that purpose, and that said proceedings might be, or would likely be, instituted against plaintiff by the prosecuting attorney of Cole county, Missouri.'' And plaintiff's instructions, so far from limiting the charge of plaintiff's alleged dereliction of duty to his failure to attend the inquest and produce the pipe and tobacco, explicitly submit the question of whether the defendant in said publication ''falsely and maliciously ascribed and imputed to plaintiff misconduct in said office, in that he was guilty of willful neglect and intentional dereliction of official duty therein.'' In other words, according to plaintiff's petition and instructions, plaintiff was complaining that the article not only charged him with failing to attend the inquest but also with a general neglect and dereliction of official duty, and with official misconduct. It is true most of defendant's instructions (but not all of them) treated the article as limiting the alleged neglect of duty to the failure to attend the inquest, but this did not have the effect of so limiting it if in fact the article itself, and plaintiff's construction thereof as set out in his petition and instructions, will bear a wider meaning and interpretation. Now, can anyone read the above article and think for a moment that the neglect and dereliction of duty charged is merely the failure to attend the inquest? Upon reading it, what is the impression created by the article as a whole? Why, that here is a sheriff who may face proceedings to oust him for dereliction of duty, who is so neglectful of duty that a proceeding to oust him from office ''under the derelict official act'' is likely to be brought. He ought to ''have done what he could yesterday toward clear-

ing up the mystery surrounding the death of Miss Anna Wendler.'' He went fishing yesterday morning and is still out of the city. But his friends (those who want to excuse and shield him) say the sheriff doesn't think the girl was murdered but that she died by accident or by her own hand. (Hence there is no need for the sheriff to bestir himself and do what he can to apprehend anyone who may be guilty of her murder.) As sheriff he has so little regard for his duty to enforce the criminal law that ''he is not careful enough of the safekeeping of persons confined in jail.'' But his friends (those will overlook his faults and excuse them) say the escapes which have occurred are not his fault. ''The jail is weak, and it is hard to keep a determined prisoner in it, *they say.*'' This morning (after there is danger of ouster proceedings against him) the sheriff returned and has at last gotten busy. Although he doesn't think the girl was murdered, yet he has now ''offered a personal reward of $100 for the arrest and conviction of the party or parties who killed Miss Anna Wendler,'' and has employed a detective to assist him in the search. The foregoing is the natural, reasonable and inevitable impression created by the article. The sum total of its effect is to charge him with ''dereliction of duty'' in general. In fact, the use of the phrase ''dereliction of duty'' in itself, means more than the mere failure to do one particular thing. ''Dereliction'' means ''the act of leaving with an intention not to reclaim or resume; an utter forsaking; complete abandonment.'' [Webster.] To say that the ''dereliction of duty,'' for which the sheriff must face proceedings to oust him from office, meant merely the failure (inadvertent or otherwise) to attend the inquest, is to put a greater compression on the meaning of the article than the language and terms used can possibly bear. The ''derelict official act'' provides that ''any person elected . . . to any county office . . . who shall fail per-

sonally to devote his time . . . to the duties of such office, or who shall be guilty of any *willful* or *fraudulent* violation or neglect of any official duty, or who shall *knowingly* or *willfully* fail or refuse to do any official . . . duty with respect to the execution or enforcement of the criminal laws of the State, shall thereby forfeit his office, etc." [Sec. 10204, R. S. Mo. 1909.] And "when any person has knowledge that any official . . . has failed, personally, to devote his time to . . . the duties of such office, or has been guilty of any *willful, corrupt* or *fraudulent* violations or neglect of any official duty, or has *knowingly* or *willfully* failed or refused to perform any official act or duty . . . with respect to the execution or enforcement of the criminal laws of this State . . . he may make affidavit, etc. . . . and it shall be the duty of the prosecuting attorney to file a complaint, etc. . . . or the prosecuting attorney may file such complaint, etc." So that anyone who read the article would understand that an official, to be liable under this act, must be guilty of failing to devote his time personally to his office, or of willful, corrupt and fraudulent violations of duty with respect to the execution and enforcement of the criminal laws of the State, and that a mere careless or inadvertent failure to attend an inquest (whether notified or not) would not be sufficient to cause such a serious proceeding to be instituted. Consequently, to say of an official that he is about to be proceeded against "under the derelict official act" is to charge him with a willful, corrupt and fraudulent dereliction of duty in general. And unless the article clearly, definitely and specifically states that the entire basis of the charge is the failure to do a certain particular act or perform a certain particular duty, the mention of the failure to do that duty will not be considered as the sole basis for the charge of dereliction of duty, but only as one instance tending to prove the general charge. The article in this case

does not do this. In view of all the foregoing, the article cannot be reasonably limited to a mere charge that the sheriff failed to attend the inquest. It charged him with a willful violation of duty generally and specifically charged him with not doing what he could to clear up the mystery surrounding the death of Miss Wendler. For the same reasons, it cannot be said that the article comes within the rule that where the antidote is carried along with the poison there is no slander or libel. Here the poison is broader and stronger than the antidote, and when that is true, the so-called antidote is not what it claims to be. In all the cases holding that the antidote cured the poison, the words containing the antidote were so plain and specific as to leave nothing by intendment or inference as to what was meant by the article. In Macurda v. Lewistown Journal, 82 Atl. 438, the libelous words complained of were that the plaintiff "was indicted here for larceny." The antidote contained in the article was the following explanation of the meaning of these words: "Specifically, Macurda is indicted for procuring a genuine signature to be affixed to an instrument, the false making of which would be forgery." The court held that, by the use of the sentence just quoted beginning with the word "specifically" the defendant had as *clearly* and *succinctly* stated the *exact* offense for which plaintiff was indicted as it was possible for the English language to convey. [Macurda v. Lewistown Journal Co., supra, l. c. 441.] In Hollenbeck v. Hall, 103 Iowa, 214, plaintiff sued for the publication of a letter which charged plaintiff with being "cowardly and dishonest" because he pleaded the Statute of Limitations when sued. But the court held that the characterization of the plaintiff's conduct as being "cowardly and dishonest" was so *clearly* and *entirely* based on the fact that plaintiff had pleaded the statute of limitation, that there could be *no mistake* as to what was meant, i. e., that plaintiff was cowardly and dishonest *solely*

*because,* when sued, he pleaded the statute, and consequently there was no libel.

Under another view we cannot hold that the dereliction charged was limited to the failure to attend the inquest, or that the antidote went along with and cured the poison even though it be conceded that, if the neglect of duty is so limited, the article is not libelous. To so hold is to say that the article as a whole is not libelous as a matter of law. But, ordinarily it is for the jury to say whether or not there has been a publication referring to the plaintiff, whether or not it is false and malicious, and *whether or not the article has the breadth meaning and scope it is alleged to have.* If, however, a publication is expressed in terms so clear and unambiguous that no circumstances are required to make it clearer than it is of itself, and but one meaning can be attributed to it, by persons of ordinary intelligence, then the court is justified in saying it is not a libel, and not until then. [Donayhue v. Gaffy, 54 Conn. 257, l. c. 266.] It certainly cannot be contended that the article so clearly, explicitly and unequivocally charges that the sheriff's alleged dereliction of duty consisted solely in his failure to attend the inquest, that we can say, as matter of law, that the article was not libelous or that the antidote was a complete cure for the poison.

Appellant next urges that the article in question was privileged because it was the report of a governmental officer upon a question of great public interest then agitating the minds of the people. And in support of such contention cites Tilles v. Pulitzer Publishing Co., 241 Mo. 609; Peoples Bank v. Goodwin, 148 Mo. App. 374; and Conner v. Publishing Co., 183 Mass. 474. In addition to what Judge ELLISON has well said on this point in the original opinion, it may be well to state that the facts in this case are not at all like those of the Tilles case. In that case the libel charged was that plaintiff, with others at the Delmar

race track in St. Louis, was engaged in the commis-
sion of an open felony. The defense was that, owing:
to a new law recently passed, it had become a vital
question of great interest to the public as to what was,
the legal status of the acts done at this race track, and
of those who congregated there and participated in
them; that, owing to the large crowds attending the
place, a local public spirit in that part of the county
had developed which was hostile to the enforcement
of the law; that the Governor had announced that he
had turned the matter over to the Attorney-General,.
the chief law officer of the State, for investigation;.
and if the law was being violated, he, the Governor,.
would call out the militia to enforce obedience to the
law; that he had directed the Attorney-General to pro-
ceed against all persons found to be violating the law
at said place; that the Attorney-General had investi-
gated the matter thoroughly and was in readiness to
proceed against such persons. The above facts were
true. It was a matter of great public interest affect-
ing the general public, who were invited to patronize
the said race track, that the *position* and *intention* of
the public authorities of the State, with reference to
the legality of the business carried on at said race
track after the repeal of the Breeders' Law, should be
publicly known. The court, at page 636 of 241 Mo.
says: "The evidence discloses that the place at the
race track would accommodate five thousand or more
people, and that it was generally filled. These visitors
no doubt were from all parts of the State, as well as
from other States. The Governor of the State had in-
vestigated the facts and the Attorney-General and
his assistant had likewise investigated the same. Con-
ferences between these officials were being held, and
contemplated action was pending. The public press,
had been for some time discussing conditions at Del-
mar race track. If the law was being violated, and

gambling permitted, the public had an interest in know-
ing the facts. If contemplated action of any kind
affecting this place of public amusement was about
to be taken, *the public was entitled to know of such
contemplated actions.*'' (Italics ours.) And on page
642 the court says further: ''Under the law it is the
duty of the State's chief executive to see that the laws
of the State are enforced. To this end he has the right
to call upon the chief law officer of the State. Both
have the right to investigate the facts, and both have,
in their respective spheres, the right to act. Under the
evidence in this case there had been an official investi-
gation. Such investigation rises to the dignity of a
privileged occasion, or at least a *quasi*-privileged oc-
casion. There was threatened action upon the part of
the chief executive and the chief law officer of the
State. And all this, too, after an investigation. The
reason for such threatened action the public was en-
titled to know, to the end that those who did not desire
to be present when wholesale arrests were made, or
the militia was called into service, might keep away
from the place. The Attorney-General in the close of
his testimony said that he was speaking officially and
intended that his opinion should be made public, on
account of the public interest which was to be sub-
served.'' And the libelous words sued on were a part
of the Attorney-General's *official opinion* of the legal
status of those persons operating at the Delmar track
and an *announcement of his intention to prosecute all
who continued to thus act at such place.*

What question was agitating the public mind in
the case before us? Certainly no question had arisen
concerning the willingness or unwillingness of any of-
ficer to act or do his duty. That was not the question.
It was not even certain that a violation of law had
been committed. There had been absolutely no inves-
tigation as to the willfulness of the sheriff in failing
to attend the inquest, nor of his neglect of other du-

ties, save perhaps the personal observation on the part of the prosecuting attorney implied in his statements that 'Hagener is not careful enough of the safekeeping of persons confined in jail.'' Nor was there any instruction or advantage to be derived by the public from knowing what the prosecutor privately thought of the sheriff. On page 645 of the Tilles case, in the italicized portion of the quotation from the English case of Davidson v. Duncan it is stated that the theory, on which is based the rule that privilege is accorded to a publication of what has taken place in a court of justice or to the announcement of a policy about to be pursued by a high government official, is that "the publication has in view the *instruction and advantage of the public,* and has no particular reference to the party concerned.'' But the publication in this case referred entirely to plaintiff and had no reference whatever to any question of great interest affecting the public. It was not an announcement of the prosecutor's intention in behalf of the public. It was simply the publication of the prosecutor's unfriendly private opinion concerning the official conduct of an individual with reference to a subject not before the public mind at all. And, in order to have something more sensational and striking in its columns and supply still more "readable stuff" for its patrons, in connection with the mysterious death of the young lady, over which alone the public mind was exercised, the defendant published this private opinion of the prosecutor in reckless disregard of the rights of plaintiff, and before any investigation could be made by anyone as to its truth. If this is privileged, then, as said by Judge Ellison, if a paper should publish that a man, however honest, was a thief, or a woman, however virtuous, was a prostitute, the publication would be privileged if it appeared on the face of the publication that a prosecuting attorney had said it in telling what

he intended to do with reference to prosecuting him or her.

In the case of Bank v. Goodwin, 148 Mo. App. 364, the alleged libel complained of was a statement of reasons why the Postmaster-General of the United States had issued a fraud order against plaintiff forbidding the use of the mails. And the court held (p. 375) that, if they were reasons given by the Postmaster-General, the publication of them was privileged because "The Postmaster-General is a high official of the National Government and his acts as such are of interest to the public." And "a fair publication made as a matter of news or public concern and without actual malice, of what such an officer does officially and the reasons he gives for his acts, should be privileged . . . considering the widely diffused interest among the people in what *great officers* of the government do in their official capacity and *the beneficial influence on the conduct of public affairs of disseminating information on the subject.*" It is thus seen that while the courts do give a privilege or *quasi* privilege to certain publications which announce the intention of what "great" or "high" officers of the government propose to do, or have done, in reference to a question of great interest to the general public, yet, by the very great pains and care taken to express themselves, the courts limit it to that class of officers and to questions about which it is to the instruction and advantage of the public to be informed. As said by Judge ELLISON, they seem to recognize that the privilege is one liable to great abuse, and consequently they endeavor to restrain the practical application of the privilege within certain well-defined limits, so as to allow no opportunity for disguised malice or reckless indifference to the rights of others. The publication complained of does not come within these limits. It was not the accouncement of the policy to be pursued by a high officer of government, or, if it was by such an

officer, it was not on a subject necessary for the public to know for their guidance and instruction, nor would its publication have a beneficial influence on the conduct of public affairs. It cannot therefore claim the privilege accorded such matters.

Appellant contends that it had a right to assume that the prosecutor had made an investigation of the facts constituting his complaint. Without deciding the question whether or not, if appellant had the right to act on such assumption, it would be of any benefit, it can be said that, under the circumstances of this case, there was no room for any such assumption. No evidence of any investigation appeared, and one instance of the sheriff's alleged dereliction of duty, his failure to attend the inquest, was too recent to have allowed an investigation as to that. Besides, the very statement of the prosecuting attorney showed that the investigation as to the sheriff's dereliction of duty was to come in the future, namely, when he was tried for neglect of official duty. In addition to this, it was shown in evidence that, in making the statements, the prosecutor was not announcing to the public the final conclusion he had reached after a thorough investigation of the matter, but simply his personal opinion on the subject. And he did not, like the Attorney-General in the Tilles case, make the statements for the purpose of having them published. On the contrary, he "did not care to air the matter."

We have carefully gone over the entire case feeling that no one ought to be held liable for the publication of anything that is not a libel or that can in law and reason be considered privileged or *quasi* privileged. But no reason has appeared to change the conclusion reached on the former hearing. The judgment, as modified by the remittitur entered in accordance with the original opinion, is, therefore, affirmed. All concur.