# Richmond

## R. W. BRAGG v. L. J. HAMMACK.[1]

November 13, 1930.

Present, Campbell, Holt, Hudgins, Gregory and Browning, JJ.

[1]See *Bragg* v. *Elmore*, 152 Va. 312.

420

*George E. Allen,* for the plaintiff in error.

*E. P. Buford,* for the defendant in error.

BROWNING, J., delivered the opinion of the court.

This is a suit by notice of motion for judgment in the Circuit Court of Brunswick county by *R. W. Bragg* v. *L.*

*J. Hammack* involving alleged libel and claiming damages in the sum of $10,000.

The notice of motion which, for convenience, will hereinafter be called the complaint, sets forth the publication of the alleged libelous words with the innuendoes of the plaintiff parenthetically stated.

The defendant in the court below, defendant in error here, filed a plea of the general issue, also a plea of justification, alleging the truth of the words complained of, and his grounds of defense which embraced the matter of the said pleas and the further defense that the occasion of the alleged publication of the words complained of was a privileged occasion, and that the privilege was not abused, and that the plaintiff did not suffer or sustain any damage by reason of the alleged publication of the words complained of.

In the course of the trial, counsel for the defendant, in explanation or elaboration of the plea of justification, said that the defendant in effect plead the truth of the language complained of with the innuendoes included, which is the effect, however, of the plea, without such assurance. The jury rendered a verdict for the plaintiff and fixed his damages at one cent, and the court entered judgment in accordance therewith.

This judgment is before this court for review upon thirteen assignments of alleged error.

The parties litigant will be referred to as plaintiff and defendant as they were related in the court below.

The plaintiff and defendant were candidates for the nomination for the House of Delegates in a Democratic primary election to be held in the county of Brunswick early in the month of August, 1927, and at the time of publication of the alleged libel the campaign was in the heat of its progress.

The plaintiff was a widower with seven children, living in a commodious dwelling some miles from Lawrenceville,

the county seat. He had previously been a member of the board of supervisors of his county and its representative in the lower branch of the General Assembly.

In the spring or summer of 1927 he employed Miss Lucille Chappell, of Clifton Forge, Virginia, as a housekeeper and companion for his children. This employment did not prove to be agreeable to either of them, and resulted in a severance of their relations under circumstances involving an unfortunate display of temper and bad feeling.

Miss Chappell left the home of the plaintiff on July 9th, after wiring her mother in Clifton Forge to meet her in Richmond, from which place they went to their home in the former city.

The day of her departure witnessed the culmination of their differences. The young lady, nervous, excited and hysterical, induced by the alleged scolding and abuse by the plaintiff, of not only herself, but of his children, announced her intention of leaving. The plaintiff opposed her leaving his home at the particular time in the frame of mind in which she then was.

To go further into these details would serve no needful purpose. It is enough to say that they were both at fault, the plaintiff perhaps more so.

On July 11th, Mrs. Lucy A. Chappell, mother of Miss Lucille Chappell, wrote a letter addressed to "Justice of the Peace, Alberta, Virginia," which was delivered to F. W. Elmore, who was at the time a justice of the peace at Alberta in the county of Brunswick.

This letter is the source of the controversy which embraces a record of 468 pages of testimony, including exhaustive arguments of counsel upon the many and tedious questions which arose.

The alleged libelous words, with the innuendoes added, comprised the postscript of said letter, and we quote them as they were declared upon in the complaint:

"Bragg (meaning the plaintiff) is not a gentleman. He (meaning the plaintiff) also wanted to ruin my girl (meaning the daughter of said Mrs. Chappell) and that the plaintiff had been guilty of immoral conduct toward said daughter. A man (meaning the plaintiff) running for office should know the law. If there are still laws in existence, and I (meaning the said L. A. Chappell) am going to enforce it." (Meaning that plaintiff had violated the law by immoral conduct toward said girl, the daughter of said L. A. Chappell.)

The justice of the peace, F. W. Elmore, carried the letter with him on the 14th of July to Lawrenceville to the office of Mr. Lewis, the Commonwealth's attorney for the county, for the purpose of having the advice of that official with reference to his duty with respect to the letter. The defendant was present and read the letter, and subsequently, when it was left with him at his office, had his stenographer type as many as six copies, one of which the defendant gave to Mr. G. E. Ellis, one of his political adherents, in addition to showing a copy to Mr. J. B. Mallory and to Dr. J. B. Mallory and to other persons in front of a drug store in the town of Lawrenceville. The defendant admits that several copies went out of his office.

Mr. G. E. Ellis testified that when the defendant gave the copy of the letter to him, which was "just like" the one which was the subject of the complaint designated Exhibit No. 1B, there were three gentlemen present and they all read it there together. The force of this particular circumstance was sought to be weakened by the further testimony of the witness that the defendant gave him the copy in response to his request for it. The defendant, however, readily supplied it from his shirt pocket. Then the usual thing happened, the copies of the letter or its contents went like wild fire and spread well-nigh over the entire county. Unfortunately scandal never travels slowly.

The extent of the publication is realized when we go a bit

into the testimony. Mr. Wilkinson testified that a copy was given him by Mr. Parrish, one of the gentlemen who read it when it was given by the defendant to Ellis, and that he showed it to Mr. Barnes.

Mr. Delbridge testified that he saw a copy at G. E. Ellis' store. Mr. Grover Jones testified that Mr. Delbridge showed it to him at Gasburg, a place seventeen miles distant from Lawrenceville. Mr. J. B. Mallory testified that he had heard about the letter, and as he was passing the door of the defendant's office he asked that it be shown him, which the defendant did. Dolby Ellis testified that a copy was shown him by Mr. G. E. Ellis at his store at Gasburg, and at the time the matter was being discussed by Mr. G. E. Ellis and Mr. Delbridge. Mr. Everett Browder testified that he received a copy of the letter, just like the one shown him on the witness stand, Exhibit No. 1B, through the mails; that it was mailed at Alberta and received by him on Friday, July 15th, at Lawrenceville. It will be noted that this was the day after the defendant had the copies made.

Mr. C. H. Williams saw a copy like it and said that one of four or five persons had it on the street and that witness asked to be permitted to take the copy and that he gave it to Mr. J. B. Edwards. Mr. J. B. Edwards showed it to Mr. Willard Clary and then burned it. Mr. W. S. Winn was shown a copy by Mr. Everett Browder. Mr. John E. Barnes saw a copy at Dolphin, about ten miles from Lawrenceville, which was shown him by Mr. M. Wilkinson. M. P. Wesson, Whitney Meredith, J. L. Parrish, Meade Flynn and J. I. Peebles all testified that they had seen copies similar to the one handed to them when they were examined as witnesses, which was Exhibit No. 1B.

Mr. W. J. Ferguson testified in part, as follows:

"Q. State the general report.

"A. The general report was that there was a letter being circulated that was from a lady who was the mother of a

young woman having been employed by Dr. Bragg in his home, and had charged Dr. Bragg with having ruined her daughter. That was the general report, and it was as general as the voters are around Butler's precinct.

"Q. Now, the rest of it, as to where the report came from and all that.

"A. I have stated that."

Mr. Buford: "We renew our objection."

The court: "It has got to be a general report."

"A. (Continued) I cannot say where the reports came from."

By Mr. Allen: "Q. What was the general report?

"A. The report was what I repeated."

By the court: "Q. That is the report, but did the general report say who circulated it?

"A. That was the general report that the letter was being circulated and having been copied by Mr. Hammack."

By Mr. Allen: "Q. Was that report discussed much around the polls?

"A. I should say so, sir.

"Q. To what extent was it discussed among the voters?

"A. That is too deep for me.

"Q. Oh, well; was it discussed a little or a great deal?

"A. It was discussed all day.

"Q. All day?

"A. Yes, sir.

"Q. In connection with Dr. Bragg's candidacy for office?

"A. Yes, sir.

"Q. Did you hear it discussed at church?

"A. Yes, sir. I heard it discussed everywhere I went in the lines of Butler's voting precinct, and up here in Lawrenceville, too."

By Mr. Buford: "Q. What I want to ask you is was not all that talk you heard on the election day due to the

publication of Dr. Bragg's and the reply to Dr. Bragg's communication?

"A. No. I did not hear newspaper squabbles discussed over there. The question that was discussed and what seemed to have the controlling effect upon the people in regard to their political proclivities was this letter charging Dr. Bragg with having ruined a woman's daughter who was employed in his home. This was the question that was being discussed."

None of the witnesses referred to ever saw the original letter except Mr. Ferguson.

The defense, in an effort to parry the effect of the publication of the libel, sought to show that the libelous reports came from the circulation of the original letter, and testimony was admitted tending to sustain this. The admission of this testimony was strenuously resisted and it was made the subject of an assignment of error which we shall presently discuss.

The defense again, and for the same purpose, undertook to show that copies of the original letter were made by other persons and put in circulation by them. The evidence shows that the only copies made, outside of the office of the defendant, were two copies made by Mr. Barrow on or after the 20th of July, nearly a week subsequent to the origin of the circulation of the publication complained of, and six copies which were made for the clerk of the court, Mr. W. E. Elmore, by Miss Hazel Rollin, who was the joint stenographer of the clerk and the defendant, and it is significant that Miss Rollin made these copies not from the original letter but from another copy.

The defendant's own testimony is quite conclusive of the question of the fact of the publication by him of the libel. The testimony adverted to and quoted simply shows the partial extent of such publication.

The first assignment of error with which we shall deal, and which is assignment of error No. 2 in the plaintiff's

brief, brings us to the consideration of the action of the trial court in refusing to strike out the defendant's plea of justification.

The chief ground of the plaintiff's motion to strike out the plea was that it presented only a conclusion of law without specifically stating the matters and things which evidence the truth of the charge so that the plaintiff might be advised as to what he had to meet.

In the case of *Williams Printing Co.* v. *Saunders,* 113 Va. 156, 73 S. E. 472, 476, Ann. Cas. 1913-E 693, Keith, P., delivering the opinion of this court, quoted from Newell on Slander and Libel, at page 652, as follows:

"A justification must always be specially pleaded, and with *sufficient particularity* to enable plaintiff to know *precisely* what is the charge he will have to meet. If the libel makes a *vague general* charge—as, for instance, that the plaintiff is a swindler—it is not sufficient to plead that he is a swindler. The defendant must set forth the specific facts which he means to prove in order to show that the plaintiff is a swindler. The plea is always construed strictly against the party pleading it. It must justify the whole of the words to which it is pleaded, and set forth facts *issuably.*" (Italics ours.) Townshend on Slander and Libel, 2nd ed. section 355, page 550: "That the justification on the ground of truth must be as broad as the charge, and must justify the precise charge, has already been considered. We have now but to point out some other requisites of a plea or answer on the ground of truth. These depend upon whether the charge is general or specific. Where the charge is in general terms, the answer must state the facts which show that the charge is true, as if the charge be that the plaintiff is a swindler, or a thief, or a perjurer, or a murderer, or that he stole a watch, or certified a lie, or was of intemperate habits, or received a bribe, or perverted the law. The distinction seems to be that when the charge is a conclusion

or inference from certain facts, then the plea must set up the facts which warrant such an inference."

Newell on Defamation, Slander and Libel (3d ed.), section 790, page 792, under heading, The General Rule:

(1) "Where the imputation complained of is a conclusion or inference from certain facts, the plea of justification must aver the existence of a state of facts which will warrant the inference of the charge. Though the charge imputed to the plaintiff be general, as laid in the declaration, the defendant must, in his plea, charge him with specific instance of offenses of the same nature with the general charge."

In an action by a female for slanderous words containing a general imputation of whoredom, an answer of justification which does not allege any specific act of whoredom on the part of the plaintiff, but alleges that she is of notorious bad character for chastity and that the words charged in the complaint are true, is not sufficient in law. *Sunman* v. *Brewin*, 52 Ind. 140.

"In plea No. 1 the charges in the declaration are simply repeated, and declared to be true. Defendant fails to give any particulars of time, place, or occasion on which plaintiff was egged out of his own county, or what man and wife he parted, or when or where; and so with the other charges set out in said plea No. 1. Under the rules of pleading as laid down by an unbroken line of authorities, plea No. 1 is wholly insufficient." *Amos* v. *Stockert*, 47 W. Va. 109, 34 S. E. 821, 825.

It will be observed that this assignment of error also calls in question the sufficiency of the defendant's plea of justification in that it did not deny that plaintiff's notice of motion put the true construction on the words complained of, nor did it justify them as having been used only in their natural and ordinary sense.

In the case of *White* v. *White*, 129 Va. at p. 629, 106 S. E. 350, 352, it is said: "We are also of opinion that the

plea is bad in the second particular urged against it in behalf of the plaintiff, above mentioned, namely, in that it does not either deny that the plaintiff's declaration puts the true construction on the admitted words or justify them as having been used only with their natural and ordinary meaning according to the usual construction and common acceptation of such language."

In our opinion the motion of the plaintiff to strike out the plea of justification in the case at bar should have been sustained.

■ The third and fourth assignments of error attack the ruling of the trial court in admitting testimony to the effect that the original letter of Mrs. Chappell had been exhibited by the justice of the peace, to whom it was delivered, to various persons, including the attorney for the Commonwealth and Mr. E. P. Barrow, his own attorney, and in allowing these persons to testify that the original letter was the subject of comment on the streets of Lawrenceville and elsewhere in the county of Brunswick at the time that the defendant had his copies of said letter made and put in circulation.

The plaintiff's case was predicated entirely on the publication by the defendant of the copies of the said letter caused to be made by him and the currency given thereto by him. Plaintiff's counsel studiously avoided any mention of or reference to the original letter.

In truth, the exhibits showed that the original letter was poorly written and thus not readily understood and interpreted. The inaccuracies were cleared up and the meaning made certain by the corrections made by the defendant in making the copies, which thereafter could be more effectively circulated.

The manifest purpose of this testimony was to counteract and offset the effect of the defendant's publication by the alleged fact that other persons had published the same or

a similar libel. Upon this testimony it might be, and indeed was, plausibly argued to the jury that little or no damage ensued to the plaintiff on account of the defendant's acts for the damage had already been done by the publication of others.

The plaintiff's brief furnishes abundant and very pertinent authorities to the effect that such testimony is inadmissible.

In the case of *Norfolk Post Corporation* v. *Wright*, 140 Va. 735, 125 S. E. 656, 658, 40 A. L. R. 579, decided by the Special Court of Appeals, December 18, 1924, opinion by present Justice Holt of this court, it is said, quoting from the opinion of Justice Holmes in the case of *Burt* v. *Advertising News Co.*, 154 Mass. 238, 28 N. E. 1, 13 L. R. A. 97:

"As a general proposition, the defendant cannot show that the plaintiff's damages are less than they otherwise would have been, because the charge has been made and published before."

And quoting from the case of *Sun Printing & Publishing Co.* v. *Schenck* (C. C. A.), 98 Fed. 925, Judge Holt continues:

"No one can say which of many defamations has destroyed or materially impaired a reputation; or whether, but for the last, the earlier ones would have made any grave impression upon the opinion of the public. It would be idle to submit such an inquiry to a jury."

In *Blackwell* v. *Landreth*, 90 Va. 748, 19 S. E. 791, 792, Judge Lacy, with reference to the admission of testimony that others had circulated the same slander charged against the defendant, said:

"This evidence was inadmissible; it is no excuse for him that others heard the same rumors.* * *

"If such evidence were allowed, the guilty party could always provide a safe shield for himself by sending the slander broadcast through the country. *Cheatwood* v. *Mayo*, 5 Munford (19 Va.) 16; Justice Parsons in *Wolcott* v. *Hall*, 6 Mass. 518 [4 Am. Dec. 173]."

In *Anthony* v. *Stephens*, 1 Mo. 254, 13 Am. Dec. 497 (at page 498), it is said:

"As to the second point in the bill of exceptions, we are of opinion that the court below erred in permitting evidence to prove that the same words were spoken by others, and that it was a current report; for if fifty or five hundred persons had made use of similar slanderous words of the plaintiff, it will not avail the defendant, either as a justification or in mitigation of damages. Each one must answer for his own acts; and if such kind of testimony were to be admitted, nothing would be more easy than, by collusion with others, to make use of the same words, thus to deprive the plaintiff of any possible mode of redress for the most slanderous charges; as all that would be necessary to be proven in a particular action would be that any other person had slandered the plaintiff also."

The objections to allowing the testimony here complained of are thus set forth by Mr. Wigmore, in the following notes on page 310:

"1882, Cave, J., in *Scott* v. *Sampson*, L. R. 8 Q. B. D. 491: 'It would seem that such evidence (rumors and suspicions as to the truth of the charge made by the defendant), is not admissible, as only indirectly tending to affect the plaintiff's reputation. If they had not affected it, they are not relevant to the issue. To admit evidence of rumors and suspicions is to give anyone who knows nothing whatever of the plaintiff, or who may even have a grudge against him, an opportunity of spreading, through the means of the publicity attending judicial proceedings, what he may have picked from the most disreputable sources, and what no man of sense who knows the plaintiff's character would for a moment believe in. Unlike evidence of general reputation, it is particularly difficult for the plaintiff to meet and rebut such evidence; for all those who know him best can say is that they have not heard anything of these

rumors. Moreover, it may be that it is the defendant himself who has started them;' a question to a witness, whether he had heard anywhere the story which was the libel in question before he saw it in the defendant's journal, was excluded.

"1836, Gibson, C. J., in *Long* v. *Brougher*, 5 Watts (Pa.) 440: 'Surely it does not lessen the injury that the plaintiff's character, bleeding from a thousand wounds, has received only the finishing blow from the defendant. Who can say that it would not have weathered the storm had it not sunk at last under the accumulated weight of the defendant's wrongs? I am unable to see the justice of estimating character by fragments, or of treating as matter of extenuation the fact that the injured party had suffered the same prejudice from another. The blow may fall heavier on sensibilities morbid from the repetition of injury. The principle has no analogue in any other part of the law; for in the pursuit of reparation for trespass to my person, I am not to be told that my battered carcass was of little worth to me by reason of a previous beating.* * * In that predicament the condition of the sufferer is an aggravation of the wrong; inasmuch as the residue of a man's soundness, whether of body or character, is the more valuable to him, because it is all that he has to depend on.* * * Now it seems to be irreconcilable to the dictates of justice that previous outrage should be made an invitation to aggression by cheapening the consequences of it to the perpetrator, * * * (or) that a stale and exploded accusation may be made a pretext for its repetition."

The learned author thus concludes:

"The better argument seems to require the exclusion of such evidence, and this is the result in the great majority of jurisdictions."

The fifth assignment of error was based upon the ruling of the court admitting the testimony of Miss Lucille

C. Chappell tending to show that the plaintiff ill-treated his children by slapping, kicking, and even cursing them.

No such charge as this was in issue here and in our view of the case the admission of such testimony would have the natural effect of diverting the minds of the jurors from the real issues to matter which was irrelevant and calculated to prejudice the plaintiff, and this result was doubtless reflected in their verdict for one cent damages.

It is true that a portion of the postscript complained of as a part of the publication is as follows: "Bragg is not a gentleman." We think that this general statement is qualified by the remaining clauses of the postscript, but if this is not so, the testimony to become relevant would need to be rendered so by an appropriate plea of justification, but it was not. We are of the opinion that the testimony should not have been admitted.

The sixth assignment of error brings us to a consideration of the propriety of the trial court in admitting the testimony of three handwriting experts to show that the entire postscript, which was the subject of the alleged libel, was written by Mrs. Lucy A. Chappell, the author of the original letter.

This was an ineffectual attempt to create a basis for the argument that the words complained of were true. For that purpose we think the testimony was inadmissable, and the more so in the face of the fact that Miss Lucille C. Chappell, a witness, who was the daughter of the author of the original letter, and the person referred to in the postscript, denied the truth of the charges contained therein and the defendant offered no evidence of their truth.

The authorship of the postscript had no bearing upon the truth or falsity of the publication complained of.

The seventh assignment of error calls in question the action of the trial court in admitting in evidence statements signed by Mrs. Lucy A. Chappell and Miss Lucille

C. Chappell, denying the genuineness of the postscript and the statements of the petitioner denying the libelous charges contained in the postscript.

It will be noted that after the defendant had circulated the typewritten copies of the letter, including the postscript, the plaintiff sought the author of the letter and her daughter, Miss Lucille C. Chappell, who gave him written statements of their own, denying the charges contained in the postscript and designating the libelous portions of the postscript as a forgery. These statements, together with an independant statement of the plaintiff, denying the truth of the charges and containing defensive matter, were published by the plaintiff in the local newspapers. None of the statements, however, as published, contained the offensive language of the postscript.

These statements were offered for the purpose of showing that the plaintiff had, himself, circulated the libel.

As to this we have to say that the plaintiff was well within his rights in defending himself. It was quite legitimate that he should do so. What he did was privileged. The publishing of the statements by the plaintiff was a part of the history of the case and its admission as evidence in the case was not error.

The eighth assignment of error brings us to the consideration of the action of the trial court in permitting counsel for the defendant to argue to the jury that the said statements signed by Mrs. Lucy A. Chappell and Miss Lucille C. Chappell, in the presence of Mr. Revercomb, a lawyer of reputable standing from Covington, Va., who accompanied the plaintiff to Clifton Forge, Va., for the purpose of conferring with these ladies as to matters connected with the letter and postscript, were obtained from them by intimidation, compulsion, or some sort of occult influence.

On page 419 of the record, one of the counsel for the defendant said in his argument to the jury:

"Can you imagine, gentlemen of the jury, anything that would be more liable to intimidate this poor old decrepit lady than for a lawyer of Mr. Revercomb's appearance, of his reputation, to have walked into her house on Sunday morning. Think of it." And again on page 427, he said to the jury: "You remember the girl under the influence of Mr. Revercomb and Dr. Bragg gave him a paper saying the only reason she left home was the work was too much for her to do. What a fabrication they got her to sign."

It is perfectly patent that the intendment of this language was that the papers in question were secured in a way that was not legitimate, to say the least. The evidence furnished no basis for it and its effect could have been none other than to prejudice the jury.

As to the remaining assignments of error, instruction "A," given by the court of its own motion, and instruction 4, given at the instance of the defendant, constitute error in view of what we have already said. They were predicated upon the truth of the charges in the libel complained of and there was no evidence of their truth and no effort to prove their truth.

Instruction "C" should have been given, for it correctly propounds the law, under the authorities we have already cited, and is applicable to this case and is not covered by the other instructions; the same is true as to instruction "I" asked for by the plaintiff.

It follows that the judgment of the trial court must be reversed, the verdict of the jury set aside, and the case remanded to the circuit court to be there disposed of in accordance with the views herein expressed.

*Reversed and remanded.*

HOLT, J., concurring.

I concur in the conclusion reached by the court in this case, but I do not find myself in accord with its position as to the seventh assignment of error.

The publication complained of was circulated during a hot political campaign, and it was necessary that the plaintiff, in order to protect himself, should make some reply, and that he did. His reply was privileged, and even if the privilege was only a qualified one it was not abused, and so is still privileged. What the defendant in this case has sought to do is to show that this reply, which was also published, was an additional circulation of the libel of the plaintiff himself, and of course the underlying purpose was that it should be considered by the jury in diminution of damages. I think this position wholly untenable, and that this publication by the plaintiff should not have been admitted in evidence, it was irrelevant to every issue here and if admitted the jury should, in some clear-cut way, have been told it was not to be considered by them for any such purpose.

CAMPBELL, J., concurs in this opinion.

HUDGINS, J., concurring.

I concur in the conclusion reached in this case, but regret that I cannot concur in holding that the testimony tending to prove the genuineness of the postscript to the letter of Mrs. L. A. Chappell is inadmissible. In my opinion, this evidence was admissible as tending to show want of actual malice on the part of the defendant, in that he did not originate the libel. This court so held in the case of *Mopsikov* v. *Cook*, 122 Va. 579, 95 S. E. 426, 427, where it is said:

"* * * if the defendant did not originate the slander, that is a circumstance which should be taken into consideration by the jury, along with all the other evidence in the case, on the question of the presence or absence of actual malice, as distinguished from malice in law."