[Civ. No. 20971. Second Dist., Div. Three. Feb. 9, 1956.]

IKALINA SHUMATE, Respondent, v. JOHNSON PUBLISHING COMPANY, INC. (a Corporation) et al., Appellants.

Loeb & Loeb, Herman F. Selvin, Allen E. Susman and Harry L. Gershon for Appellants.

Leo Branton, Jr., for Respondent.

VALLÉE, J.—Appeal by defendants from a judgment for plaintiff entered on a jury verdict in an action for libel.

"Jet" is a periodical with national circulation published weekly in Chicago by defendant Johnson Publishing Company. Defendant John H. Johnson is editor and publisher of "Jet."

Plaintiff and Dr. Lincoln Shumate were married in June 1952. They were well-known Negro residents of Los Angeles. On April 23, 1953, plaintiff filed suit for separate maintenance against Dr. Shumate alleging adultery with a named white woman on a number of occasions. Dr. Shumate cross-complained for divorce, alleging plaintiff had persistently refused to have marital relations with him and had committed adultery on several occasions with one Lorenzo Spencer, the husband of Vaino Spencer, plaintiff's attorney in the separate maintenance action. These charges and counter-charges were widely featured in the Negro press of Los Angeles and other cities.

On May 5, 1953, Lorenzo Spencer filed an action against Dr. Shumate for libel based on the allegations of the cross-complaint. Immediately thereafter, Dr. Shumate retracted all of his charges of adultery between plaintiff and Spencer, and signed an agreement which is set out in the margin.[1]

---

[1] "AGREEMENT RE: SETTLEMENT AND DISMISSAL OF LORENZO SPENCER v. LINCOLN SHUMATE S.C. 613 377.

"It is mutually agreed by the parties hereto as follows:

"Lincoln W. Shumate, the defendant in the above mentioned action by these presents agrees and promises in consideration of the Dismissal With Prejudice of the above mentioned action by the Plaintiff, Lorenzo Spencer and his attorneys, to do the following: Said Lincoln W. Shumate agrees at such times and by such means as set forth and requested by the plaintiff, Lorenzo Spencer, and his attorneys, to refute, withdraw, and disclaim, and to state that said statements and all of them were

He thereupon dismissed the cross-complaint against plaintiff, and Spencer dismissed the libel suit against Dr. Shumate.

On May 6, 1953, James Goodrich, a writer for defendant company and Hollywood editor of "Ebony," a magazine published by defendant company, called on Mrs. Spencer at the direction of the managing editor of "Jet." Mrs. Spencer showed Goodrich a copy of the retraction Dr. Shumate had signed and told him Dr. Shumate was dismissing his cross-complaint. Prior to May 14 Mrs. Spencer sent Goodrich at his request a statement of the status of the separate maintenance action, which he forwarded to the Chicago office of "Jet."

On May 14, 1953, Dr. Shumate issued a sworn public apology which is set out in the margin.[2] On the same day Mrs. Spencer sent a copy of the apology to Goodrich. Goodrich immediately sent the copy of the apology to the managing editor of "Jet" in Chicago.

In the May 14, 1953, issue of "Jet" there was published an article titled "WEALTHY LOS ANGELES MEDIC CHARGES

untrue in connection with charges and statements and inferences made by said Lincoln Shumate to the effect that said Lorenzo Spencer was guilty of having engaged in adulterous and illicit conduct and relation ships with the present wife of said Lincoln Shumate, Ikalina Shumate. It is agreed and understood further in this connection that said Lincoln Shumate will make a public statement of apology for having made such charges aforesaid in any and all newspapers, or other publications desig nated by the plaintiff aforesaid and his attorneys. Further said Lincoln W. Shumate agrees to pay for all expenses, including attorney fees and detective fees, incurred by said Lorenzo Spencer in the filing and pre paring of the aforesaid action."

[2] "PUBLIC APOLOGY OF DOCTOR SHUMATE

"Recently, I made the charge in a cross-complaint for divorce that Lorenzo Spencer was guilty of having engaged in adulterous and illicit conduct and relationships with my present wife, Ikalina Shumate.

"I wish to state publicly that I know now these allegations to be untrue. These charges were made as a defense to a divorce proceeding instituted against me by my wife, Ikalina Shumate.

"The charges, which I now know to be without foundation in fact, were made under the stress and emotion of a domestic upheaval that clouded my judgment. I am now convinced beyond a reasonable doubt that there was nothing improper in the relationship between Lorenzo Spencer and my wife, Ikalina Shumate. For these reasons, I withdraw the allegations and offer my deepest apology to all concerned, and par ticularly to Lorenzo Spencer for the great wrong I have committed.

"I have instructed my attorneys to withdraw any and all charges of adultery or misconduct against my wife and Lorenzo Spencer. I agree and consent that this statement may be disseminated in any field or medium at the option of Ikalina Shumate and/or Lorenzo Spencer.

"I hope that my apology will in some measure ameliorate the humil iation and embarrassment occasioned to all concerned."

Signed, "Lincoln W. Shumate."

WIFE WITH ADULTERY," set out in the margin,[3] with photographs of plaintiff, Dr. Shumate, Spencer, and Mrs. Spencer. In the May 28, 1953, issue of "Jet" there was published an article titled "Calif. Medic Drops Adultery Charge Against Wife," set out in the margin.[4] Nothing was said in the article about the apology.

On August 14, 1953, plaintiff was granted an interlocutory decree of divorce from Dr. Shumate by default on the ground of cruelty. Dr. Shumate did not testify.

In the August 27, 1953, issue of "Jet" there was published the article on which this action is predicated. It reads:

"ARE WOMEN CHANGING OUR SEX MORALS?

"By Robert Johnson

"A wealthy Los Angeles physician became the subject of considerable tongue-wagging recently as the result of a

---

[3] The article read: "Wealthy Dr. Lincoln Shumate filed a divorce cross-complaint in Los Angeles domestic relations court, charging that his fourth wife, Mrs. Ikalina Savoy Shumate, persistently refused sex relations with him but was intimate on several occasions with Lorenzo Spencer, a real estate broker with whom she works. Dr. Shumate said his wife told him, 'I don't love you, I never did; I only married you for assurance of my support, and to obtain the things I desire.' He also charged that she refused to keep a clean home and humiliated him by calling him 'stupid.'

"Dr. Shumate filed his cross-complaint after Mrs. Shumate, his fourth wife in five years, sued him for divorce, charging that he had committed adultery with a white woman, Mrs. Margaret C. Piper, of Long Beach, Calif., the mother of three children. To Dr. Shumate's complaint that she refused to have 'reasonable sex relations' with him, Mrs. Shumate stated: 'I can only refer you to the Kinsey Report.' In her petition, Mrs. Shumate asked the court to restrain Dr. Shumate from disposing of any of his finances and said he was capable of earning $3,500 a month. Denying all her accusations and claims to alimony, Dr. Shumate said that as a real estate saleswoman, Mrs. Shumate is capable of self-support, earning approximately $600 a month.

"Both Mrs. Shumate and Spencer were represented by Los Angeles' 'newest and most beautiful' woman lawyer, Vaino Hassan Spencer, who is also the wife of Spencer. The Shumates were married at Las Vegas Nev., last June 26 and separated on March 19 of this year, according to court records."

[4] The article read: "Los Angeles physician-socialite Dr. Lincoln Shumate dropped an adultery charge against his fourth wife, Mrs. Ikalina Savoy Shumate, and realtor Lorenzo Spencer. The retraction followed a closed conference, at which the realtor promised to cancel a $100,000 libel and slander suit if Dr. Shumate would publicly withdraw adultery charges and pay detective and attorney fees in the case. The wealthy physician had accused his wife of being intimate with Spencer after she claimed in a separate maintenance suit that he committed adultery with white Mrs. Margaret C. Piper of Long Beach, Calif. The out-of-court settlement also called for amending Mrs. Shumate's maintenance suit to simple divorce and gave her the two family autos plus approximately $10,000 in cash. Dr. Schumate [sic] paid Spencer approximately $2,100 plus legal expenses."

divorce action he brought against his pretty socialite wife. He testified that his wife had disregarded her marital vows to bestow intimate favors upon her employer, but had repeatedly refused marital relations with him. The wife, however, countered. In defense of her seeking a lover and rejecting her husband's love-making, she told the court: 'I can only refer you to the Kinsey report.'

"What family secrets the accused wife revealed in her brusque remark became immediately apparent to friends of the couple, but the surprised doctor had not considered that his wife would go to such lengths in defending her marital misbehavior. For like many husbands who cling to the age-old concept of a double standard in marriage morality, he had rushed to a divorce court, secure in the knowledge that it would be the wife who would be held up to public ridicule for her sexual misconduct.

"Today, however, husbands are becoming more and more aware that double standards in sex morals have all but disappeared where wives are concerned, and the old adage, 'What's good for the goose is good for the gander' is a more widely accepted code for modern women. Says New York gynecologist and psychiatrist Dr. Lena Levine: 'It's not a matter of the old-fashioned sex codes being no longer accepted. Rather, among more and more women, the codes are not even considered.'

"Actually, the release this week of information contained in Dr. Alfred Kinsey's long-waited report, *Sexual Behavior in the Human Female* (see next page), will point up startlingly that women have changed our sex morals. It will reveal that there remains little correlation between our Puritannical codes and the actual sex adventures of women.

"Experts and counselors in courtship, marriage and family relations also point out that sex morals have become more relaxed because of a behavior trend which points to: 1) increasing premarital sexual adventures and promiscuity among women; 2) increasing marital unfaithfulness among 'emancipated' wives; 3) increasing acceptance of easy divorce and quick remarriage without moral or social stigma.

"Explained one counselor: 'In the past when her mate was not particularly virile, the wife was secretly glad. Today, woman is becoming more released. She very well may go elsewhere when she finds the man not as capable as she might

like. The same often holds true for the wife who suspects that her husband is cheating.'

"Sociologist Walter H. Chivers who conducts marriage and family institutes in Negro colleges, has also noted among young people an increased concern over sex mores. Says he: 'On most college campuses, the opinion is that the mores are not as strong as they used to be. Yet, every man wants to believe that infidelity is associated not with his woman, but the other woman.' " On the page on which the article begins there is a sketch of three nude women, each with an arm around the other. Immediately next to the article, the following appears in a box:

"WHAT KINSEY WILL TELL ABOUT WOMEN

"Pre-marital Relations

"*About 50 per cent of married women have premarital sexual relations.*

"Unfaithful Wives

"*More than one-fourth (26 per cent) of all married women cheat on their husbands and a large percentage of them—mostly college-educated—plan to continue their infidelities.*

"Homosexuality

"*Nearly one-fifth of all women (about 19 per cent) have homosexual contacts at some time in their lives.*

"Virginity

"*While clinging to their 'virginity,' some 32 per cent of women experience an emotional climax through petting with men. Techniques range from simple kissing to unconventional sex practices.*

"Love-Making

"*During marriage, more than half of all women allow their husbands to practice oral love-making, and about 49 per cent of them engage in similar practices with their husbands.*

"Morality

"*If sex laws were rigidly enforced, about 85 per cent of all women would be jailed as sex offenders for committing 'unnatural, immoral, abnormal or indecent acts.' "*

The evidence is undisputed that the article was published of and concerning plaintiff and that readers derived from the words a defamatory meaning and understood them to refer to plaintiff.

The jury returned a verdict for plaintiff against defendants Johnson Publishing Company and John H. Johnson

for $5,000 general damages and against each of them for $5,000 exemplary damages. Defendants appeal from the judgment that followed. Defendants also appeal from the order denying their motion for a new trial. Since that order is not appealable, the appeal therefrom will be dismissed.

The assignments of error are: (1) "Jet" is a newspaper as a matter of law and since plaintiff neither demanded a retraction nor pleaded or proved any special damages, Civil Code, section 48a, precludes recovery. (2) The evidence without contradiction established that the allegedly libelous article was true. (3) The court erred in striking a copy of a Los Angeles newspaper from the evidence. (4) There is no evidence to support the awarding of exemplary damages against either defendant.

■ Defendants may not urge the first assignment of error. The complaint alleged that "Jet" is "a weekly magazine of national circulation." The answer of defendants admitted the allegation. At the opening of the trial defendants were permitted to file an amended answer in which they denied the allegation and alleged "Jet" is a newspaper. In presenting her case in chief plaintiff offered no evidence on that issue except the copy of "Jet" containing the allegedly libelous article and other copies of "Jet." At the close of plaintiff's case in chief defendants made a motion for a judgment of nonsuit on the ground "plaintiff has failed to offer any evidence whatsoever on the issue of whether this is a magazine or a newspaper. I think that plaintiff has alleged that this is a magazine, and that is denied; and that is certainly in issue." The motion was denied. Two witnesses were called by defendants as experts. Each testified over plaintiff's objection that "Jet" is a newspaper. The testimony of one of them was stricken apparently on the ground that he was not qualified. Other than the superior court file in the separate maintenance action, defendants' evidence was directed solely to proving that "Jet" is a newspaper and not a magazine. Defendants offered and the court gave three instructions, the effect of which was to submit to the jury as a question of fact whether "Jet" is a magazine or a newspaper.[5] Plaintiff proffered no instructions on the ques-

---

[5]The instructions offered by defendants and given read:

1. "A newspaper is 'A paper printed and distributed at stated intervals, usually daily or weekly to contain news, advocate opinion, and usually containing also advertisements and other matters of public

tion. Defendants tried the case on the theory the question whether "Jet" was a magazine or a newspaper was one of fact. Here they seek reversal on the theory the question is one of law. ■ The theory on which the case was tried in the court below must be followed on review. (*Gibson Properties Co.* v. *City of Oakland,* 12 Cal.2d 291, 299 [83 P.2d 942] ; *Collins* v. *Graves,* 17 Cal.App.2d 288, 296-299 [61 P.2d 1198].) ■ A party cannot successfully take advantage of asserted error committed by the court at his request. (*Jentick* v. *Pacific Gas & Elec. Co.,* 18 Cal.2d 117, 121 [114 P.2d 343].) The request that the jury be instructed as requested by defendants necessarily constituted consent to submission of the issue as a question of fact to be resolved by the jury. (*Brown* v. *Kiely,* 126 Cal.App.2d 191, 193 [271 P.2d 928].) ■ A party cannot request that an issue be submitted to a jury as a question of fact and on review escape the consequences. (*Cockerell* v. *Title Ins. & Trust Co.,* 42 Cal.2d 284, 288 [267 P.2d 16] ; *Knowles* v. *Roberts-at-the-Beach Co.,* 115 Cal.App.2d 196, 198 [251 P.2d 389].) This is not a case of an attorney submitting to an erroneous ruling. Defendants did not introduce responsive evidence to offset or explain erroneously admitted evidence. (*Cf. Hoel* v. *City of Los Angeles,* 136 Cal.App.2d 295, 310 [288 P.2d 989].) ■ Their motion for judgment of nonsuit was based on the contention plaintiff had introduced no evidence to the effect that "Jet" was a magazine. Defendants gambled on a favorable verdict and lost. They will not now be permitted to urge that the question is one of law.

The second assigned error is that the article complained of is substantially true. In other words, defendants claim the implied finding of the jury that the article is false is not supported by the evidence. "Libel is a false and unprivileged publication by writing . . . which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency

---

interest.' It is also defined to be a publication in numbers, consisting commonly of single sheets, and published at short and stated intervals, conveying intelligence of passing events. A magazine is defined as a periodical containing miscellaneous papers, especially critical and descriptive articles, stories, poems, etc., designed for the entertainment of the general readers.''

2. ''The plaintiff must prove by the preponderance of the evidence that Jet is a magazine and not a newspaper or you must find for the defendants.''

3. ''If you find that the publication Jet is a newspaper, you must find for the defendants.''

to injure him in his occupation'' (Civ. Code, § 45). There can be no question but that the publication is defamatory. ■ The law infers that a defamatory publication is false. (16 Cal.Jur. 32, § 9.) ■ The burden of proving the truth of the article was therefore on defendants. (*Draper* v. *Hellman Coml. T. & S. Bank*, 203 Cal. 26, 41 [263 P. 240]; *Dethlefsen* v. *Stull*, 86 Cal.App.2d 499, 506 [195 P.2d 56].)

Defendants say the article ''states in substance that a wealthy Los Angeles physician brought a much publicized divorce action against his pretty socialite wife, that he testified that his wife had bestowed her 'intimate favors' upon her employer rather than her husband, that in defense of such a contention the wife had told the court, 'I can only refer you to the Kinsey report' and that that comment had surprised her husband'' They argue that the evidence was undisputed that the article is true in these particulars: 1. Dr. Shumate cross-complained for divorce. 2. Much publicity attended the charges; the case was mentioned in three issues of ''Jet'' and ''in headlines'' in three Los Angeles newspapers circulated to the Negro population and in plaintiff's home town newspaper, the Minneapolis ''Spokesman.'' 3. Dr. Shumate had alleged that plaintiff had repeatedly refused marital relations with him and had instead committed adultery with Spencer on a number of occasions. 4. Plaintiff had voluntarily gone to the office of the Los Angeles ''Tribune,'' one of three local Negro publications, and had there given an interview to a reporter about the case and had told the reporter that reference should be had to the Kinsey report for an explanation of the marital problems between her and Dr. Shumate.

Defendants' epitome of the article is inept and incomplete. The article said Dr. Shumate testified that plaintiff ''had disregarded her marital vows to bestow intimate favors upon her employer.'' He had not so testified. True, he had so alleged in his cross-complaint but he had immediately retracted and issued a public apology, no mention of either was made in the article although defendants had knowledge of them—leaving the definite impression in the mind of the reader that there was truth in the charges. The charges were false and defendant company knew the facts. The article says plaintiff, in ''defense of her seeking a lover and rejecting her husband's love-making,'' told the court, '' 'I can only refer you to the Kinsey report.' '' The implication is obvious that

plaintiff had admitted she had sought a lover. It was false. The implication is clear that she had rejected her husband's love-making. There was no evidence she had done so. The article says she had told the court, " 'I can only refer you to the Kinsey report.' " She had made no such statement to the court. It is clearly stated in the article that plaintiff had been guilty of "marital misbehavior," of "marital unfaithfulness," of "sexual misconduct," that she had indulged in "sexual adventures," and was unchaste. There was no evidence of the truth of any of these statements. They were false. The article refers to the box which follows titled "WHAT KINSEY WILL TELL ABOUT WOMEN." A reader of the article, coupled with the box, may reasonably have understood that plaintiff had had "pre-marital sexual relations," that she is one of those who "cheat on their husbands," that she may be one who has "homosexual contacts," that she may be one who commits "unnatural, immoral, abnormal or indecent acts." There was no evidence of any kind, character, or description that any one of these charges was true in any respect. They were false. No person of ordinary intelligence could fail to perceive that the publication was intended to suggest that plaintiff is a sexual deviate. The fact that the publication contained true matter relative to the pleadings in the separate maintenance action did not justify branding plaintiff as a sexual deviate. (See *Newby* v. *Times-Mirror Co.*, 173 Cal. 387 [160 P. 233, Ann.Cas. 1917E 186]; *Newby* v. *Times-Mirror Co.*, 46 Cal.App. 110 [188 P. 1008].) It is no defense that merely a part of a publication is true. In determining whether a publication is libelous, it must be considered in its entirety. It may not be divided into segments and each part treated as a separate unit. (*Stevens* v. *Storke*, 191 Cal. 329, 334 [216 P. 371].) In the case at bar the publication in its entirety includes the title "ARE WOMEN CHANGING OUR SEX MORALS?", the sketch of three nude women, the article, and the Kinsey report included in the article by reference. If any material part be not proved true, the plaintiff is entitled to damages in respect to that part. (Odgers, Libel and Slander, 6th ed., 149.) The truth of the gist or sting of the defamation was not shown. Whether the article is true was for the jury. The evidence fully supports the implied finding that it is false.

Defendants, over plaintiff's objection that it was hearsay and that no sufficient foundation had been laid for its ad-

mission, introduced in evidence a copy of the May 1, 1953, issue of the Los Angeles "Tribune," a publication circulated among the Negro population. Later in the trial, on motion of plaintiff, the court struck the copy of the "Tribune" from the evidence. Defendants assert error. The "Tribune" contained a lengthy article relative to the action between the Shumates; their love life; Dr. Shumate's matrimonial adventures; the Spencer libel action; an interview a "Tribune" reporter had had with Vaino Spencer, plaintiff's attorney in the separate maintenance action; an interview a "Tribune" reporter had had with plaintiff about the charges and countercharges in that action; and running quips and comment by the writer. The article in part said: "Referring to her husband's charge in a divorce action that she had refused to have 'reasonable sexual relations' with him, Mrs. Shumate, 31-year-old real estate saleswoman, mysteriously quipped in a statement issued to the papers Wednesday, 'I can only refer you to the Kinsey Report.'" At the trial plaintiff testified: "A reporter asked me about the allegation that my husband made against me, to the effect that I was cold and indifferent. When that particular question was put to me, I made a reference to that section of the Kinsey Report, that states that professional men frequently are frigid to their wives, because they are out busy doing their work. At that particular time, it was—it was just a general reference to the Kinsey Report"; she had given an exclusive interview to a "Tribune" reporter; she did not know at the time the person she talked to was a reporter; she was a real estate saleswoman and went to the "Tribune" office to deliver some advertising material and a young woman who, she presumed, was an employee started to talk to her; after the interview the "Tribune" published the article and in it "reference was made to the Kinsey Report."

The argument is that the article "tended to prove that plaintiff, instead of being a reticent, publicity-shy, sensitive woman as her direct testimony would lead one to believe was quite the converse," and aided in establishing the truth of the "Jet" story. The "Tribune" article was clearly hearsay and inadmissible. (*Wilson* v. *Fitch*, 41 Cal. 363, 383-385; *Hearne* v. *De Young*, 132 Cal. 357, 362 [64 P. 576]; *Bebbington* v. *California Western etc. Ins. Co.*, 30 Cal.2d 157, 160 [180 P.2d 673, 1 A.L.R.2d 361]; *Clark* v. *North American Co.*, 203 Pa. 346 [53 A. 237, 239]; *Hayes* v. *Press Co.*, 127

Pa. 642 [18 A. 331, 14 Am.St.Rep. 874, 5 L.R.A. 643]; *Bragg v. Hammack*, 155 Va. 419 [155 S.E. 683, 687-688, 74 A.L.R. 723]; *Hagener* v. *Pulitzer Pub. Co.*, 172 Mo.App. 436 [158 S.W. 54, 60].) There was no evidence that the publication in issue was founded on the "Tribune" article, or that the "Tribune" article provoked the publication sued on, or that the writer of the "Jet" article or the publisher of "Jet" knew of it or believed it to be true, or that it was a reliable source of information, or that there was any investigation of the matter before publication in "Jet." (See *Turner* v. *Hearst*, 115 Cal. 394, 401 [47 P. 129]; *Davis* v. *Hearst*, 160 Cal. 143, 182-183, 189, 194 [116 P. 530].) There is nothing in the "Tribune" article suggesting that plaintiff is a woman who is changing sex morals. If the purpose of the offer was to show what plaintiff said to the reporter, and if what she said was admissible, the reporter should have been called. There was no evidence that the reporter who had the interview with plaintiff wrote the article. The article was offered as a whole. Obviously the reporter's interview with plaintiff's lawyer in the separate maintenance action and his quips and comments throughout the article were not admissible, nor were Dr. Shumate's matrimonial adventures. ▮ Where an offer of evidence includes several different matters, some of which are vulnerable to objection, it is not error to reject the whole. (*Eaton* v. *Brock*, 124 Cal.App.2d 10, 16 [268 P.2d 58].)

It is said it was necessary for plaintiff to refresh her recollection by the article and that that made it admissible in its entirety. On cross-examination of plaintiff defendants' counsel questioned her, seeking to show she had said to the "Tribune" reporter, "I can only refer you to the Kinsey Report." She answered repeatedly she had not made that exact statement. Defendants' counsel then had her read the first two paragraphs of the article and asked her again whether she had made the statement, "I can only refer you to the Kinsey Report," to the reporter. Plaintiff again answered she did not remember making that exact quotation. Plaintiff did not refresh her recollection from the article. ▮ Furthermore, the opponent, not the questioning party, has a right to have admitted in evidence a document used to refresh the recollection of a witness. (*Estate of Packer*, 164 Cal. 525, 530 [129 P. 778]; *Estate of De Laveaga*, 165 Cal. 607, 631 [133 P. 307]; *Hawkins* v. *Sanguinetti*, 98 Cal. App.2d 278, 284 [220 P.2d 58].)

Defendants also say the article was admissible to refute the claim of malice. We find nothing in the article which would in the slightest degree tend to show an absence of malice. ''The rule is that evidence *aliunde* the publication sued on is admissible, as in mitigation of damages, only where it is manifest that such evidence can and will show or tend to show that the defendant, in making the publication complained of, acted in good faith and with honesty of purpose, and not maliciously.'' (*Newby* v. *Times-Mirror Co.*, 46 Cal.App. 110, 126 [188 P. 1008].) Everything in the article which purports to be a statement of what plaintiff may have said to the ''Tribune'' reporter was fully developed at the trial, and it appeared in the May 28, 1953, issue of ''Jet.'' It is also said the article should have been admitted because it was true. The only evidence as to the truth of any part of the article is that plaintiff made a statement to the reporter about the Kinsey report and the content of the pleadings in the separate maintenance action, all of which is in evidence. In any event, the mere fact that the article might be true would not make it admissible in evidence. It is also said the article was admissible to impeach the testimony of plaintiff. Obviously it was not. If defendants wished to impeach the testimony of plaintiff with respect to what she said to the reporter, the reporter should have been called.

The final contention is that the awards of exemplary damages cannot be upheld. ''In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant.'' (Civ. Code, § 3294.) A plaintiff is never entitled as a matter of right to exemplary damages. (*Brewer* v. *Second Baptist Church*, 32 Cal.2d 791, 800-801 [197 P.2d 713].) In order that they may be recovered there must be proof of ''the presence of malice in fact, that is the motive and willingness to vex, harass, annoy, or injure.'' (*Davis* v. *Hearst*, 160 Cal. 143, 162 [116 P. 530].) The malice which may be ''express'' or ''implied'' is malice in fact; it is ''express'' when established by direct evidence and ''implied'' when established as an inference from indirect evidence of its existence. (*Freeman* v.

*Mills,* 97 Cal.App.2d 161, 168-169 [217 P.2d 687]; 16 Cal. Jur. 134, § 101.) ▮ The trier of fact may infer malice in fact from the tenor of the publication of a libel which is actionable *per se.* The publication in *Childers* v. *San Jose Mercury P. & P. Co.,* 105 Cal. 284 [38 P. 903, 45 Am.St.Rep. 40], charged the plaintiff with the commission of a felony. The court declared (p. 290):

''In this publication malice in law is not only conclusively presumed, but such malice in fact is implied or presumed as to establish *prima facie* the right of plaintiff to exemplary damages. In other words, the existence of malice. in fact is sufficiently shown by the publication to make the question an issue before the jury. That exemplary damages may be based alone upon a publication libelous *per se* we have many authorities from many states. [Citations.] In *Warner* v. *Press Pub. Co.,* 132 N.Y. 181 [30 N.E. 393], the principle is thus declared: 'The plaintiff gave evidence of malice when she proved the falsity of the libelous publication, and, in the absence of evidence on the part of the defendant tending to show that it had neither the desire nor the intention to wrong her, it would have been the duty of the court to instruct the jury that the plaintiff might be awarded exemplary damages in their discretion; but testimony was adduced on the part of the defendant, tending to prove the absence of actual malice on his part towards the plaintiff, which, taken in connection with the evidence of malice which the law imputed when the falsity of the libel was established, presented a question of fact whether malice existed in the publication. If found to exist, then, in their discretion, the jury could award exemplary damages.' While there may be authority in some states opposed to the principle declared in the foregoing citation, yet in this state, in view of section 3294 of the Civil Code, to which we have adverted, there would seem to be no question as to the true rule.'' (Also see *Tingley* v. *Times-Mirror Co.,* 151 Cal. 1, 15 [89 P. 1097]; *Davis* v. *Hearst,* 160 Cal. 143, 166, 178-180 [116 P. 530]; *Snively* v. *Record Publishing Co.,* 185 Cal. 565, 576-579 [198 P. 1]; *Brewer* v. *Second Baptist Church,* 32 Cal. 2d 791, 799 [197 P.2d 713]; *Newby* v. *Times-Mirror Co.,* 46 Cal.App. 110, 131-132 [188 P. 1008].) ▮ Whether malice may or may not be inferred from the intrinsic evidence which the publication affords is for the trier of fact to say. (*Walker* v. *Chanslor,* 153 Cal. 118, 125 [94 P. 606, 126 Am.St.Rep. 61,

17 L.R.A.N.S. 455] ; *Davis* v. *Hearst*, 160 Cal. 143, 166, 173 [116 P. 530].)

 The implied finding of the jury that defendant company was motivated by malice in fact is amply justified by the intrinsic character of the publication and the other circumstances shown by the evidence. Defendants introduced no evidence to show the absence of malice on their part in publishing the article. It was published notwithstanding the fact defendant company three months before had received a copy of Dr. Shumate's apology. There was no showing that defendants had any justification or excuse for publishing plaintiff to the world as a typical woman who is changing our sex morals. The substance of the publication is directed toward proving that women are changing our sex morals. It offers three categories as evidence of the fact: (1) a specific example—plaintiff; (2) a general discussion of such women and how they change sex morals, using the term "wife" or "wives," implying that all that is said is applicable to plaintiff; (3) the Kinsey report, to illustrate the extent to which and how women, including plaintiff, are changing sex morals. There is no mention of teen-agers, single women, widows, or any other category that constitutes a group of women, changing our sex morals. Everything in the article is pointed to how a wife, typified by plaintiff, is changing sex morals. Having implied that plaintiff is a sexual deviate and that she is typical of the women who are changing sex morals, a reader would normally take the statements about the Kinsey report as applicable to her. The appendage of the Kinsey report is obviously a statistical statement showing how many "plaintiffs" there are.

Defendant John H. Johnson was the editor and publisher of "Jet" and acting both individually as such editor and publisher and as the agent of defendant company. It has been said the editor of a publication is presumed to have knowledge of its contents. (*Smith* v. *Utley*, 92 Wis. 133 [65 N.W. 744, 745, 35 L.R.A. 620] ; *Faulkner* v. *Martin*, 133 N.J.L. 605 [45 A.2d 596] ; *Fry* v. *Bennett*, 28 N.Y. 324, 330.) Johnson verified the original answer in which it is alleged the publication is true in substance and in fact. He thus sanctioned and ratified the publication after knowledge that plaintiff asserted it to be libelous and when in fact it was libelous *per se*. (*Westerfield* v. *Scripps*, 119 Cal. 607, 611 [51 P. 958] ; cf. *Davis* v. *Hearst*, 160 Cal. 143, 168 [116 P.

138

530].)[6] " 'The manner of statement is material upon the question of malice, and if the facts believed to be true are exaggerated, overdrawn, or colored to the detriment of plaintiff, or are not stated fully and fairly with respect to the plaintiff, the court or jury may properly consider these circumstances as evidence tending to prove actual malice, and they may be sufficient for that purpose without other evidence on the subject.' " (*Brewer* v. *Second Baptist Church*, 32 Cal.2d 791, 799 [197 P.2d 713], quoting from *Snively* v. *Record Publishing Co.*, 185 Cal. 565, 578 [198 P. 1].)

 The evidence conclusively shows the publication of a libelous article reflecting on plaintiff's personal moral character and conduct. Johnson affirmed the truth of these charges by justification in the verified answer. Their falsity was established on the trial. There was an entire absence of the truth of any of them. These and other facts and circumstances afforded evidence from which the jury could have inferred the existence of oppression and of malice on the part of Johnson—a motive to vex, harass, and annoy plaintiff. It was not sufficient for defendants to show merely that Johnson was absent from the state to repel the inference. Such a state of facts in the mind of the jury could well coexist with positive instructions from Johnson, the editor and publisher, to publish the article, leaving it to the writer to

---

[6]In *Reynolds* v. *Pegler*, 223 F.2d 429, Judge Medina wrote (p. 434):

"The mere fact that there was no proof of personal ill-will or animosity on the part of any of the corporate executives toward plaintiff does not preclude an award of punitive damages. Malice may be inferred from the very violence and vituperation apparent upon the face of the libel itself, especially where, as here, officers or employees of each corporate defendant had full opportunity to and were under a duty to exercise editorial supervision for purposes of revision, but permitted the publication of the column without investigation, delay or any alteration whatever of its contents. The jury may well have found on this evidence a wanton or reckless indifference to plaintiff's rights.

"There is always a certain risk involved in the pleading of truth as a defense, since in proper cases and under proper instructions the jury may infer malice from the fact that a defendant repeats the defamatory matter, which is later found to be false. But here answers were served on behalf of each defendant, which not only repeated but elaborated upon the matters set forth in the original defamatory publication; even the tone and characteristics of the pleading are reminiscent of the style of the column in suit, although the answer is said to have been composed by one or more of the lawyers. It will not do to beg off on the plea that there is no proof that any of the corporate officers read this pleading before it was filed in court and that it is unverified and bears only the subscription of counsel. Despite all this, the fact remains that those who composed this answer and caused it to be filed were acting within the scope of their authority and what they did is binding upon defendants."

select the mode of attack. ▮▮▮ "[W]here the evidence offered by the plaintiff is such that from it the jury may infer the existence of malice in fact, the burden is cast upon the defendant of destroying this inference by proof that neither by general nor particular instructions were the publications authorized, and that neither in fact nor by his conduct were they ratified when knowledge of their publication was brought home to him." (*Davis* v. *Hearst*, 160 Cal. 143, 168 [116 P. 530].) Johnson offered no evidence of this character, nor any explanation of the article, nor any justification for its publication. ▮▮▮ He could have testified he had no intent to injure plaintiff and to his honest belief in the truth of the article. (*Walker* v. *Chanslor*, 153 Cal. 118, 125 [94 P. 606, 126 Am.St.Rep. 61, 17 L.R.A.N.S. 455]; *Fleet* v. *Tichenor*, 156 Cal. 343, 348 [104 P. 458, 34 L.R.A.N.S. 323]; *Runo* v. *Williams*, 162 Cal. 444, 450-453 [122 P. 1082].) He did not testify. The jury could infer from his failure to testify that such was not his intent or belief. We cannot say as a matter of law there is no evidence to support the implied finding that Johnson was motivated by malice in fact. (*Scott* v. *Times-Mirror Co.*, 181 Cal. 345, 361-362 [184 P. 672, 12 A.L.R. 1007].)

The appeal from the order denying the motion for a new trial is dismissed; the judgment is affirmed.

Shinn, P. J., and Wood (Parker), J., concurred.